# TERRITORY OF HAWAII *v.*
# JOSEPH KAIMI JOSIAH.

## No. 3029.

ARGUED JANUARY 16, 1958.                    DECIDED MARCH 25, 1958.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

No reversible error was committed by the trial court in refusing to give one of defendant's requested instructions, the substance thereof being covered by other instructions given by the court.

OPINION OF THE COURT BY RICE, C. J.

The defendant-plaintiff in error, Joseph Kaimi Josiah, hereinafter referred to as the defendant, was jointly indicted with his brother, Robert Francis Josiah, by a grand

jury of the circuit court, first circuit, Territory of Hawaii, on March 25, 1953, for murder in the first degree of one Earl Takao Fujita. After being arraigned on March 27, 1953, an amended indictment containing two counts, respectively, count I alleging deliberate premeditated murder, and count II alleging murder with "extreme atrocity and cruelty," was returned by the same grand jury on April 9, 1953. The defendant and his brother were duly arraigned on April 10, 1953, at which time the circuit judge entered a statutory plea of "not guilty" for both. On February 10, 1954, a motion for severance and separate trial was entered on behalf of Robert Francis Josiah; said motion was granted after argument on February 15, 1954. The trial of defendant commenced on February 23, 1954, before a jury in the circuit court of the first circuit, Territory of Hawaii, with the Honorable Carrick H. Buck presiding. After a lengthy trial the case was finally submitted to the jury on March 25, 1954. The jury was unable to agree upon a verdict and a mistrial was entered on March 26, 1954.

On the 28th day of October, 1954, a second trial of the defendant was commenced before another jury and another judge in the said circuit court, the Honorable Albert M. Felix presiding. The trial of the case lasted until November 22, 1954, when the jury returned a verdict of "Guilty as charged." On December 1, 1954, a motion for a new trial was filed, and after hearing thereof on December 8, 1954, it was denied. On January 3, 1955, the defendant was sentenced to suffer the death penalty. An order staying execution of sentence to April 3, 1955, was issued by Judge Felix. On April 1, 1955, pursuant to application made therefor on behalf of the defendant, a writ of error was issued out of this court and the case has accordingly come up for review.

The opening brief for the defendant specifies twelve

consecutively numbered alleged errors, which are hereinafter set forth in the order given in the brief.

## "ERROR NO. 1

"That the Circuit Court (Trial Judge) erred in admitting in evidence, over Defendant's objection, Territory's Exhibit No. 11 (a photograph of the cranium of the deceased Fujita after the top of the skull had been removed) in that said Exhibit No. 11 portrays a physical condition resulting from a post mortem surgical operation, could have no probative value (because of all the other evidence) and due to its gruesome nature simply served to inflame and prejudice the Jury against the Defendant.

## "ERROR NO. 2

"That, in the presence of the Jury and while the Territory's witness, George Akana, was on the stand and while ruling upon Defendant's objection pertaining to the involuntary nature of any statements, admissions or confessions made by the Defendant to said witness or in his presence, the Circuit Court (Trial Judge) erred in making the following remarks and findings:

'THE COURT: The evidence so far adduced, and from the evidence adduced in the preliminary hearing, does not establish to the mind of this Court, any such elements of compulsion as under our law will render a statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. Court finds the statement, if any statement was made, was made voluntarily. Objection is overruled.' (Tr. pg. 809)

That the Circuit Court (Trial Judge) committed prejudicial error in making the aforesaid remarks and findings in the presence of the Jury in that said remarks

and findings are findings of fact with reference to questions of fact which were for the ultimate determination of the Jury, and the Circuit Court's remarks and findings are therefore an interference with the province of the Jury. That furthermore said remarks and findings included reference to evidence adduced at the preliminary hearing (which took place in the absence of the Jury and which evidence the Jury had no right to hear) and for that reason were additionally prejudicial to Defendant.

"ERROR NO. 3

"That, in the presence of the Jury and while the Territory's witness, Leonard Gunderson, was on the stand and while ruling upon Defendant's objection pertaining to the involuntary nature of any statements, admissions or confessions made by the Defendant to said Witness or in his presence, the Circuit Court (Trial Judge) erred in making the following remarks and findings:

'THE COURT: The Court finds that there has been a proper foundation laid. The Court finds there has been a corpus delective [sic] proven. The Court finds that the question of illegal arrest is immaterial. The Court finds that the evidence so far adduced does not establish in the mind of this Court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence either in this hearing or in the preliminary hearing of any force or threat, any offers of immunity or hope of reward. Court finds that this statement was made voluntarily.' (Tr. pp. 842, 843)

That the Circuit Court (Trial Judge) committed prejudicial error in making the aforesaid remarks and findings in the presence of the Jury in that said remarks

and findings are findings of fact with reference to questions of fact which were for the ultimate determination of the Jury, and the Circuit Court's remarks and findings are therefore an interference with the province of the Jury. That furthermore said remarks and findings included reference to evidence adduced at the preliminary hearing (which took place in the absence of the Jury and which evidence the Jury had no right to hear) and for that reason were additionally prejudicial to Defendant.

## "ERROR NO. 4

"That, in the presence of the Jury and while the Territory's witness, Leon M. Strauss, was on the stand and while ruling upon Defendant's objection pertaining to the involuntary nature of any statements, admissions or confessions made by the Defendant to said Witness or in his presence, the Circuit Court (Trial Judge) erred in making the following remarks and findings:

'THE COURT: Your objection as to defendant not being advised of his Constitutional rights is overruled. Your objection that he was not warned of his, violation of his Constitutional rights under the 5th, 6th, and 16th —

'MR. RIDLEY: 14th

'THE COURT: — Amendment is overruled. Your objection that there was an illegal arrest, and that the confession is inadmissable [sic] is overruled. The evidence so far adduced at this hearing, and the preliminary hearing, does not establish to the mind of this Court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. Court finds the state-

ments were made voluntarily.' (Tr. pp. 881, 882) That the Circuit Court (Trial Judge) committed prejudicial error in making the aforesaid remarks and findings in the presence of the Jury in that said remarks and findings contain findings of fact with reference to questions of fact which were for the ultimate determination of the Jury, and the Circuit Court's remarks and findings are therefore an interference with the province of the Jury. That furthermore said remarks and findings included reference to evidence adduced at the preliminary hearing (which took place in the absence of the Jury and which evidence the Jury had no right to hear) and for that reason were additionally prejudicial to Defendant.

## "ERROR NO. 5

"That, in the presence of the Jury and while ruling upon Defendant's motion to strike the testimony of the Territory's witness, Leon M. Strauss (said motion pertaining to the involuntary nature of any statements, admissions or confessions made by the Defendant to said Witness or in his presence), the Circuit Court (Trial Judge) erred in making the following remarks and findings:

'THE COURT: The motion to strike because the defendant was illegally arrested is overruled. The motion to strike all the testimony because the detention was illegal pursuant to 10701 and 10711 is overruled. Motion to strike because the defendant was not advised of his Constitutional rights, because he was not advised he could get an attorney if he wanted one, because he was not advised that any statements he may make may be used against him because he was not advised he did not have to make any statement if he didn't want to, that motion is also overruled. Court finds the evidence so far ad-

duced at this hearing, and at the preliminary hearing, does not establish to the mind of this court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. This Court finds the statement was made, both statements were made voluntarily.' (Tr. pp. 900, 901)

That the Circuit Court (Trial Judge) committed prejudicial error in making the aforesaid remarks and findings in the presence of the Jury in that said remarks and findings contain findings of fact with reference to questions of fact which were for the ultimate determination of the Jury, and the Circuit Court's remarks and findings are therefore an interference with the province of the Jury. That furthermore said remarks and findings included reference to evidence adduced at the preliminary hearing (which took place in the absence of the Jury and which evidence the Jury had no right to hear) and for that reason were additionally prejudicial to Defendant.

"ERROR NO. 6

"That, in the presence of the Jury and while the Territory's witness, Daniel Stone, was on the stand and while ruling upon Defendant's objection pertaining to the involuntary nature of any statements, admissions or confessions made by the Defendant to said Witness or in his presence, the Circuit Court (Trial Judge) erred in making the following remarks and findings:

'THE COURT: The objection to the, on the ground it is not a true reproduction of the statement given is overruled. To the objection that the defendant was not legally under arrest, that he was

not taken before a magistrate and he was not served with any warrant prior to make [sic] this statement, that is overruled. The objection that the statement was made without informing defendant the statement could be used against him is also overruled. The objection that defendant was not warned he could refuse to make any statement if he so desired is overruled also. The fact there was no warrant of arrest prior to making the statement is overruled. So far as the objection that the statement was not given voluntarily, under duress, and undue influence, the Court finds that the evidence so far adduced in this hearing, and the preliminary hearing, does not establish to the mind of this court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. The Court finds the statement was made voluntarily.' (Tr. pp. 932, 933)

That the Circuit Court (Trial Judge) committed prejudicial error in making the aforesaid remarks and findings in the presence of the Jury in that said remarks and findings are findings of fact with reference to questions of fact which were for the ultimate determination of the Jury, and the Circuit Court's remarks and findings are therefore an interference with the province of the Jury. That furthermore said remarks and findings included reference to evidence adduced at the preliminary hearing (which took place in the absence of the Jury and which evidence the Jury had no right to hear) and for that reason were additionally prejudicial to Defendant.

"ERROR NO. 7
"That the Circuit Court erred in denying Defend-

ant's Motion that a mistrial be declared on the grounds that the findings of the Court, as quoted herein above in the immediately preceding Assignment of Error, were prejudicial error.

"ERROR NO. 8

"That the Circuit Court erred in denying Defendant's oral Motion to Dismiss the Second Count of the Indictment, which motion (Tr. pg. 1150) reads [was] as follows:

'MR. RIDLEY: At this time, if Your Honor please, we move to dismiss the second count, it is a special motion, special motion to dismiss the second count of the indictment on the grounds that there is absolutely no sufficient evidence in the records with reference to any savagery, brutality or in other words, extreme atrocity or cruelty sufficient to go to the jury and as far as the rest of the count is concerned, it is purely surplus, it is but a common count, in other words, we consider it is insufficient grounds, insufficient evidence as a matter of law to sustain —'

"ERROR NO. 9

"That the Circuit Court erred in refusing to give Defendant's requested Instruction No. XXXV, which reads as follows:

'In determining whether or not any statement, confession or admission was made by the defendant freely and voluntarily and without compulsion or coercive persuasion, you may take into consideration all of the circumstances under which it was obtained including the nature and circumstances of his arrest, the fact that after his arrest the defendant was not advised that he was entitled to consult a lawyer, the fact that the defendant was not advised that he would not have to make any statement and

that any statement made could be used against him whether the evidence does or does not disclose that any undue coercion or pressure was brought upon the defendant at the time when the statement, confession or admission was given or made and whether the evidence does or does not disclose that the defendant was in fear of its equivalent at the time the statement, confession or admission was given or made. You may also take into consideration the defendant's social and educational background, in so far as they have been disclosed to your satisfaction by the evidence, and any other evidence reflecting upon the defendant's intelligence or apparent state of mind at the time any such statement, confession or admission was given and made.'

"ERROR NO. 10

"That the verdict of the Jury, and the findings of the Court based thereon (Tr. pg. 1236) are contrary to the law, the evidence and the weight of the evidence.

"ERROR NO. 11

"The Circuit Court erred in refusing to grant Defendant's Motion for a New Trial (dated and filed December 1st, 1954) upon all the grounds therein stated and more particularly upon the following grounds:

'1. That said verdict is contrary to the law.

'2. That said verdict is contrary to the evidence.

'3. That said verdict is contrary to the weight of the evidence.

'4. That there is no sufficient, competent and material evidence to support said verdict.

'5. That said verdict was the result of bias, prejudice and passion on the part of the jury.

'6. That the Court erred in admitting in evidence, over Defendant's objection, Territory's Exhibit No. 11 because of its inflammatory and

prejudicial effect upon the Jury and as a result thereof, the said Exhibit No. 11 caused the Jury to become inflammed [sic] and biased and prejudiced against the Defendant.

------------------------------------------------

'19. That the Court erred in refusing to grant Defendant's motion (made in open Court, in the presence of the Jury, on November 15, 1954) that a Juror be withdrawn and a mistrial be entered because of the prejudicial effect of the Court's findings (made immediately preceding said motion) in the presence of the Jury, which findings were as follows:

"Court finds the evidence so far adduced at this hearing and at the preliminary hearing does not establish to the mind of this Court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offer of immunity or hope of reward. This Court finds the statement was made, both statements were made voluntarily."

'20. That the Court erred in refusing to grant Defendant's motion to dismiss count II of the indictment in that there was insufficient evidence to show that the killing of the deceased, Earl Fujita, was done with extreme atrocity or cruelty.

------------------------------------------------

'24. That the Court erred in refusing to give Defendant's r e q u e s t e d Instructions number I, II, III, XVI, XVIII, XXX, XXXV, XXXVI, XXXVII, XXXVIII, XXXIX, XLI, XLII, XLIII.

------------------------------------------------'

"ERROR NO. 12

"That the Circuit Court erred in passing sentence

upon the Defendant in that the verdict of the Jury was contrary to the law, the evidence and the weight of the evidence and defendant's motion for a new trial should have been granted."

In his several objections to the admissions of statements, admissions, or confessions alleged to have been made by the defendant, the latter's counsel, Mr. Ridley, referred to sections 10701-10709, inclusive, and section 10711, R. L. H. 1945 (now sections 255-1 to 255-9, inclusive, and section 255-11, R. L. H. 1955).

In substance, section 10701 prohibited arrest without a warrant or other process therefor from some magistrate, "except in the cases in this chapter provided or otherwise provided by law." Section 10702 provided for arrest by virtue of an oral order of any magistrate, or without such order if no magistrate be present, where breach of the peace or other offense had been committed, "and the offender shall endeavor to escape." Section 10703 provided for arrest without warrant, by any person present, of any one in the act of committing a crime. Section 10704 provided that in the event of a commission of a crime and the offenders be unknown, any person found near the place where the crime was committed, "either endeavoring to conceal himself, or endeavoring to escape, or under such other circumstances as to justify a reasonable suspicion of his being the offender, * * * may be arrested without warrant." Section 10705 provided that policemen, or other officers of justice, in any seaport or town, "even in cases where it is not certain that an offense has been committed, may, without warrant, arrest and detain for examination such persons as may be found under such circumstances as justify a reasonable suspicion that they have committed or intend to commit an offense." That Honolulu is a "seaport or town" is a matter of judicial knowledge. Section 10706 provided that at or before the time of making an

arrest, "the person must declare that he is an officer of justice, if such be the case." Further, that he having a warrant, he should show it if required or if making the arrest without a warrant "in any of the cases in which it is authorized by law," he should give the party arrested the cause for the arrest and require him to submit and accompany him to the jail or magistrate. Section 10707 provided that "such degree of force may be used as is necessary to compel him to such submission" in all cases of refusal of the person arrested to submit or of attempts to escape. Section 10708 povided that he who makes an arrest may take from the party arrested all offensive weapons about such person and deliver them to the magistrate, to be disposed of according to law. Sections 10709 and 10711 are below quoted in full.

"Sec. 10709. Examination after arrest; rights of arrested person. It shall be unlawful in any case of arrest for examination (1) to deny to the person so arrested the right of seeing, at reasonable intervals and for a reasonable time at the place of his detention, counsel or a member of such arrested person's family; or (2) to unreasonably refuse or fail to make a reasonable effort, where such arrested person so requests and prepays the cost of such message, to send a telephone, cable, or wireless message through a police officer or another than the arrested person to such counsel or member of such arrested person's family; or (3) to deny to counsel (whether retained by such arrested person or a member of his family) or to a member of such arrested person's family the right to see or otherwise communicate with such arrested person at the place of his detention (a) at any time for a reasonable period for the first time after such arrest, and (b) thereafter at reasonable intervals and for a reasonable time; or (4) in case the person arrested has requested

that he see an attorney or member of his family, to examine such person before he has had a fair opportunity to see and consult with such attorney or member of his family; or (5) to fail either to release or to charge such arrested person with a crime within forty-eight hours of his arrest in all cases in which such person is arrested on suspicion of having committed a crime.

"Sec. 10711. Entering house to arrest. Whenever it is necessary to enter a house to arrest an offender, and entrance is refused, the officer or person making the arrest may force an entrance by breaking doors or other barriers. But before breaking any door, he shall first demand entrance in a loud voice, and state that he is the bearer of a warrant of arrest; or if it is in a case in which arrest is lawful without warrant, he must substantially state that information in an audible voice."

The several specifications of error will be commented upon in their order.

Specification of error number one presents for review the admissibility in evidence of Territory's exhibit number eleven (a photograph of the inside of the cranium of the deceased Fujita after the top of the skull had been removed in the course of an autopsy). In the opening brief on behalf of the defendant it is stated that the objection thereto is that it "portrays a physical condition resulting from a post mortem surgical operation, could have no probative value (because of the other evidence) and due to its gruesome nature simply served to inflame and prejudice the Jury against the Defendant."

The transcript of proceedings in the trial court discloses that when the offer of the exhibit in evidence was made the objection thereto was that: "* * * it is offered simply and solely for the purpose of inflaming the jury * * *. It is prejudicial to the defendant. It has no

probative value upon the bearing of this case which exceeds the prejudice, which would automatically affect, by the inflamatory [sic] effect of the same."

Dr. Alvin V. Majoska, pathologist and director of the health department laboratory of the city and county of Honolulu, being on the stand as a witness for the prosecution, had testified, *inter alia,* that on the dates January 9, 1953, and January 10, 1953, he had occasion to perform a post-mortem examination of the person pictured in prosecution's exhibit eight (who was identified by another as Earl Takao Fujita).

After stating in essence his findings upon the external examination of the body, the doctor further testified, that:

"* * * When the skull was examined, there was found a considerable degree of bruising of the temporal muscles. They are the muscles in the temporal area of the skull, immediately in front of the ear, the ears. After the scalp was removed from the skull, the primary defect into the skull measured approximately one by one and a half inches, but the bone fragments about the defect were fragmented so that the defect was considerably larger than one by one and a half inches. The skin and muscles of the nerves of the face had been deeply undercut and separated from the bone through this primary defect. Upon opening the skull it was found that the durameter or the membrane covering the brain beneath the defect in the skull was torn and after examining the inner aspects of the skull there were found three distinct depressed fractures over the back part of the skull separate and apart from this large primary defect. Two of these depressions were in the left side and one on the right. The brain showed a marked degree of maceration and laceration, that is, chewing up and tearing of the left frontal and temporal lobes. Those are the areas immediately

beneath the defect that I mentioned. Those in essence are the findings on January 9th.

"Q Doctor, you have used the term 'primary defect.' Will you explain that?

"A This defect that I have called the 'primary defect,' was the primary cause of death in this case and which was the most striking finding upon examination of the body."

Shown prosecution's exhibit eight, the doctor in response to questioning pointed out the general area of the defect and then stated:

"* * * The scalp here is reflected back somewhat and brain material may be seen deep in that defect there just to the left of the left eyebrow.

"Q You also, doctor, referred to three separate depressions. Will you explain those?

"A These depressed fractures of the skull were produced when the head was struck by some solid object. The scalp was cut thereby and the force of the blow produced a depressed fracture of the skull. By analogy, a depressed fracture would be similar to a light blow struck to a hard boiled egg where the egg shell is caused to dip into the substance of the egg without the egg itself fracturing completely around."

It was after that last above quoted testimony that the doctor was shown prosecution's exhibit eleven for identification. Asked whether he recognized it, he answered in the affirmative and, when asked what it was, said: "That is a view of the inside of the skull in this case." Then, in response to questioning, he pointed out in that photograph the major primary defect that he had been talking about and the other three separate fractures. Thereafter the exhibit was, over objection, received in evidence and marked prosecution's exhibit eleven. The exhibit was shown to the jury and referring thereto the doctor testified:

"The brain has already been removed from the skull cavity here, and this photograph is a photograph of the inner surface of the skull. Here it may be seen that there is some darkened tissue and that is scalp that has been injured during the making of that wound. Here a fracture line may be seen extending and here there is, as I mentioned there was fragmentation of the bone around that defect, and that is the defect in general there. The depressed fractures.

\* \* \* \* \*

"\* \* \* When I'm speaking of primary defect, I am not speaking of one from the standpoint of chronological sequence but the one of primary importance in the causation of the death of this individual. The depressed fragmentation here may be readily seen looking at it from the inside. There is a small bulge, bulging inward with fracture lines arranged about the bulge. Here is another small one and the third one here is rather difficult to see because of the light reflex but I do know that that is the area of that fracture and the light reflex is from the indentation of the skull at that point.

\* \* \* \* \*

"MR. DESHA: Q Doctor, I notice that on Exhibit 11, you have circled, made a circle on it?

"A Yes.

"Q What was that first, what was that circle enclosed?

"A That is the defect in the skull.

"Q Is that what you have been referring to as the primary defect?

"A Yes.

"Q Will you put your initials just right next to that circle? Will you number that '1'?

"A (Witness marks exhibit)

"Q In regard to the other three separate depressions that you testified to, will you circle the first one and

your initials? Circle Number 2, then circle 1, also circle the other two depressions, please, marking that Number 3 and Number 4.

"A (Witness marks exhibit)

"Q Now, these depressions, Doctor, are fractures, is that correct?

"A Yes.

"Q At this time, with the Court's permission, I would like to show this to the jury.

"(Exhibit passed to the Jury)"

Undoubtedly, prosecution's exhibit eleven was of assistance to the jury in intelligently understanding Dr. Majoska's testimony. In that respect it had probative value. It also had probative value in respect to count II of the indictment, to the effect that the murder charged was committed with extreme atrocity and cruelty. It does not impress this court as more gruesome or likely to inflame and prejudice the jury against the defendant than prosecution's exhibit eight, which latter was admitted in evidence without objection. The admission in evidence of prosecution's exhibit eleven was mainly, if not entirely, one of discretion of the trial court and, in view of the testimony of Dr. Majoska which preceded its admission and that it was admitted for the purpose of clarifying his testimony, this court deems that the discretion of the trial judge was properly exercised and that court did not commit error in its admission of the exhibit in evidence. Further, the admission of it in evidence accords with what is said in Scott, *Photographic Evidence,* Sec. 661, pp. 570, 576, 577; and in *Territory* v. *Joaquin,* 39 Haw. 221, 228 (1951), the authorities cited therein; *Territory* v. *Abellana,* 38 Haw. 532, 543; *People* v. *Gomez,* 209 Cal. 296, 286 P. 998 (1930); *People* v. *Mazza,* 287 P. (2d) 798, 805 (1955); *Monson* v. *State,* 63 S. W. 648 (The Court of Criminal Appeals of Texas, June 19, 1901); and *Griffin* v. *State,* 198

S. W. (2d) 587 (1947) ; also *State* v. *Fiore,* 94 N. J. L. 477, 110 Atl. 909 (1920).

Specifications of error numbers two, three, four, five, six, and seven are severally based upon what was said by the trial judge, in the presence of the jury, when, from time to time during the course of the trial, he ruled upon defendant's objections to admissibility of alleged admissions, statements and confessions of the defendant to one or several of the Territory's witnesses on different occasions.

George Akana, a member of the Honolulu police department, was on the stand as a witness for the Territory. He had testified that on January 9, 1953, he first saw the defendant at 1003 North Vineyard street, in the city and county of Honolulu, at about 5:15 P.M. He, the witness, had gone there with detective Leonard Gunderson. When they arrived at the house, they knocked on the door, were greeted by Mrs. Katie Josiah (mother of the defendant), they identified themselves as police officers and asked her for her two sons. She immediately asked them to come into the house and they went in. Mrs. Josiah called and her son Joseph (the defendant) came into the living room. Detective Gunderson then took out his badge, showed it to Joseph and placed him under arrest for murder. The witness Akana further testified that at that time Mrs. Josiah, the mother, started to cry and kept repeating the phrase, "Son, what is this all about. Tell me, tell mama, what this is all about," or something to that effect. She said that about three or four times. Then Gunderson said, "You want to tell your mother or you want us to tell her." In response to that Joseph had said: "Well, I may as well tell you guys. You guys know all about it already."

The direct examination of the witness Akana continuing, the following ensued:

"Q  Will you tell the court and the jury what Joseph

said at 1003 North Vineyard Street?

"MR. RIDLEY: I take it then, Your Honor, that this question covers the so-called alleged admission made at the time, is that it, Mr. Desha?

"MR. DESHA: Yes, it does.

"MR. RIDLEY: It does? May I object to the question, then, if Your Honor please, on the grounds that it is, there is no proper foundation laid for the question, it affirmatively appears from the evidence adduced from this witness that the defendant's Constitutional rights guaranteed under the 4th, 5th, and 14th Amendments were violated at the time, there is or there was no proper search warrant required by law to make an arrest, and the defendant was not advised as to his rights and was not advised that any remark he might make could be used against him and the arrest was made contrary to the provisions of Sections 10701, 10709 inclusive, and in view of the statement of the witness concerning the defendant's condition, about the perspiring and the circumstances surrounding, the crying of his mother, etc., it affirmatively appears from the evidence any statement he may have given was obtained under duress and with undue influence and it was not voluntary. That is my objection.

"THE COURT: Duress and what?

"MR. RIDLEY: Duress, undue influence and therefore was not voluntary."

Specification of error number two is based upon the remarks and ruling of the court as follows:

"THE COURT: The evidence so far adduced, and from the evidence adduced in the preliminary hearing, does not establish to the mind of this Court, any such elements of compulsion as under our law will render a statement or confession involuntary. There has been no evidence of any force or any threats, any offers of

immunity or hope of reward. Court finds the statement, if any statement was made, was made voluntarily. Objection is overruled.

\* \* \* \* \*

"THE WITNESS: After he made the statement to the effect that, 'Well, I may as well tell you guys. You guys all, you guys know all about it,' he said this. 'Yes, we pulled the stick up and we killed the guy.'

"Q Did he say at any time who the guy was that he killed?

"A Mentioned the name Earl.

"Q Defendant say anything else?

"A Yes. He went on to tell us about his wife's troubles, financial troubles, his wife had left him and all his children and he was in debt, been garnisheed, matters of that nature, and that being the reason why he had to commit this offense, to pull this job.

"Q How long did that take, Joseph's tell you about this?

"A Briefly about 5 minutes.

"Q Did either you or Gunderson ask him questions at that time?

"A No, sir. We were trying to get him, to get dressed to come down to headquarters.

"Q After he gave this statement, what happened?

"A Gunderson asked Joseph to come along with him and they started for the front door.

"Q And what happened?

"A Just as they were stepping out of the front door, I called Gunderson to come back into the house. I then asked Joseph about the payroll.

"Q Then what happened?

"A He said, 'You guys want the payroll.' And I said, yes. He walked into the bedroom which is just a few feet away from the living room, reached under one of

the beds and brought out a cardboard box similar to that of a shoe box.

"Q What did he do with it?

"A He handed it to Gunderson.

"MR. RIDLEY: Your Honor please, there is an additional objection to this matter of the payroll, I would like to note of record. It violates, any testimony in this regard violates the constitutional rights against unlawful searches and seizures. I think that is covered in the previous objection.

"THE COURT: Objection is overruled.

"MR. RIDLEY: May I have an exception?

"THE COURT: A exception be noted.

"MR. RIDLEY: And may I have a running objection to all the testimony by way of admission, Your Honor?

"THE COURT: You are not having a running objection, the objection to the admission is already made.

"MR. RIDLEY: I understand, but in case I, there is any variation from the admission or anything may I have a running objection without having to stand up every moment and waste the time of —

"THE COURT: You are objecting to all testimony and statements made by Joseph Josiah to Officers Akana and Gunderson, and detective —

"MR. RIDLEY: That is correct, and that —

"THE COURT: In regard to any statement he may have made regarding this crime?

"MR. RIDLEY: That is correct.

"THE COURT: Let the record so show.

"MR. DESHA: Q After he handed this card board box to Gunderson, what happened?

"A Gunderson in turn handed it over to me. I opened the box and viewed the contents and I saw that there

were numerous pay envelopes with the, which had printing on it, Higa, Y. Higa Trucking Company.

"Q You say there were, there was printing on it? Was there any writing on these pay envelopes?

"A Yes, printing and writing."

"Q Officer Akana, I show you Prosecution's Exhibit 20 for Identification and ask you whether or not you can identify that, and how do you identify it?

"A Yes, this is the box and the contents that was turned over to Detective Gunderson and I at 100 North, 1003 North Vineyard Street, January 9, 1953. I have on this box written in my own handwriting, my initials, G.A. the case number, F35187, the time being 10:35 P.M., the date being 1-9-53, which I myself marked in my own handwriting down at police headquarters. I also have here one of the pay envelopes which I examined, which I opened and examined the contents to see if the currency and coins did coincide with the figures appearing on the shall we call this the pay slip with the taxes, Territorial taxes and all the deductions listed to see, and to see whether the net figure on the slip would correspond with the cash and coins in this particular pay envelope.

"Q Did you, you counted it?

"A Yes.

"Q Did it correspond?

"A Yes, sir.

"Q Did you count the amount of envelopes in the box?

"A Yes, after completing this particular, the details on this particular envelope, I counted the entire amount of envelopes in this box.

"Q What was the total amount?

"A 82, this box contains 82 pay envelopes, similar to this envelope."

Detective Leonard Gunderson being on the stand as a

witness for the Territory and having testified to having gone to the home at 1003 North Vineyard street with Detective Akana and having there arrested the defendant, the following ensued in the presence of the jury.

"Q At any time prior to the defendant giving you this statement at the house, in the parlor, did he ask for an attorney?

"A No, sir.

"Q Other than this period that he hesitated and then finally told you his statement, once he started telling you this statement, giving you the statement, did he refuse to continue?

"A No, sir.

"Q Did he at any time ask to have his Constitutional rights read to him?

"A No, sir.

"Q You say as soon as he said, made the statement, 'since you know all about it, I may as well tell you,' he gave this statement, is that correct?

"A Yes, sir.

"Q What was the statement?

"MR. RIDLEY: Just a moment, if Your Honor please. May I object to the question on the grounds there is no proper foundation has been laid, on the further ground that the corpus delecti [sic] in this case has not been established which is included in the no foundation, no proper foundation, on the further ground it affirmatively appears from the evidence of this witness that the arrest was illegal, not in conformity with Sections 10701 to 10711 inclusive of the Revised Laws of Hawaii 1945, that it affirmatively appears from the evidence that any statement given by the defendant was given under duress and undue influence, was not made voluntarily and that the defendant was not properly advised or guaranteed or given

the rights which are guaranteed under the 4th, 5th, 14th amendments of the Constitution, U. S. Constitution."

Specification of error number three is based upon the remarks and ruling of the court as follows:

"THE COURT: The Court finds that there has been a proper foundation laid. The Court finds there has been a corpus delective [sic] proven. The Court finds that the question of illegal arrest is immaterial. The Court finds that the evidence so far adduced does not establish in the mind of this court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence either in this hearing or in the preliminary hearing of any force or threat, any offers of immunity or hope of reward. Court finds that this statement was made voluntarily.

"MR. RIDLEY: May I —

"THE COURT: If any such statement was made.

"MR. RIDLEY: May I assign Your Honor's findings as prejudicial error and take exception to Your Honor's ruling?

"THE COURT: Let the record so show.

"MR. DESHA: What did the defendant say?

"THE WITNESS: Well, the defendant stated that at the time he was divorced from his wife, and that he resided, he was residing with his mother. Further he stated that he was having domestic difficulties with his wife. He was trying to get her to come back but she refused and that he was up to his neck in bills. Stated that he owed about $2600. in bills and didn't know how he was going to pay it all off. Further stated that couple of times he tried to take his own life, and further added that he had planned to pull off this robbery for quite some time. He stated that he knew just on what days, what time, and who had control of the payroll money,

so on the day of the offense, he stated that about 12 :15, he and his brother drove their car down in the vicinity of the Libby-McNeill pineapple cannery to wait for the passing of Earl Fujita whom they knew was going to take the payroll money down in the Kalihi area. He stated that they waited for a few minutes and they noticed Earl Fujita driving his car towards Kalihi on Nimitz Highway. He said he, he called to Earl Fujita to stop, but Fujita could not come to a stop right then and there due to the fact that he was using the inside lane of traffic. Fujita drove a short ways down the road, then pulled on the side, and they came up on their car and he got off and he walked up to the car driven by Earl Fujita and when Earl Fujita saw him, Fujita told him, 'Hi, Joe.' So he then opened the right front door of the car and he got in. At that time, he stated that he pulled out the gun which he had stuck in the front part of his waist band, pulled the gun out and he pointed it at Earl Fujita, and told him, 'This is a stick up.' Earl Fujita asked him if he was joking, he said, 'no,' he wasn't joking. So then Fujita asked him why he was doing a thing like that, and he told Fujita that he needed the money badly and he was desperate for money. That he was up to his neck in bills. Then he asked Earl Fujita how much was in the payroll. Fujita told him there was about $3,000 in that particular payroll. Then he stated he made Earl Fujita drive his car up to the Red Hill district and he rode in the car with Earl Fujita, while his brother followed, driving his car. When they got up to the scene, he made Fujita back his car off the highway. Then he took the payroll money which was in a cardboard box, and he put it in his car. Then he made Earl Fujita walk down a little gully. Earl Fujita then asked him whether they were going to tie him up. He said, yes,

they were going to tie him up. Then Earl Fujita, and he also asked Earl Fujita if Earl was going to turn him in. Fujita told him, yes, he had to turn him in because someone had to take the rap. Then he pointed the gun at Earl Fujita and stated that he pulled the trigger. He stated then that the gun didn't go off. It did not fire but instead of that the clip fell off the gun, fell to the ground. It was when Earl Fujita saw this, Earl Fujita jumped him and they got into a fight. He stated that there was a terrific fight there and that his brother came to his aid and grabbed Fujita from the back and held him and he struck Fujita a number of blows on his head and body with the gun. Then he stated that the gun flew out of his hand, fell on the ground. Told his brother to pick it up, so the brother picked up the gun and the brother also struck Fujita with the gun. After a while, he said Fujita just layed there on the ground. So he grabbed Fujita by the shirt and lifted him up and noticed that there were a number of cuts on his head and that he was bleeding quite badly. So he eased Fujita back on the ground and both of them then walked away from the gully, they got into their car and they drove off. He further stated that his clothing and also the clothing of his brother had blood on it so they drove around trying to find a place to wash up. They couldn't find a place so they figured well, they would telephone home and see if there was anyone at home. So they made a phone call to their home, no one answered the phone. Thinking that no one was home, they then drove back home and parked the car in the garage. Then while they were walking into the front yard, he noticed his father lying down on the couch or sofa on the front porch. They didn't want to disturb him in any way so they walked around the side of the house, went to the back and

they hid the gun under the rear portion of the house. Anyway they took a bath and then he stated that the brother took their bloody clothing and also the gun and drove off presumably he said to go and hide it, to get rid of it, and he took a shower and after a short while Detective Akana and myself arrived at his home.

"Q  You took notes on this?

"A  I did, sir.

"Q  While the defendant was giving his statement?

"A  Yes, sir.

"Q  After he gave this statement, what happened?

"A  Then I asked him what happened to the money? And he asked me if I wanted the money. I told him, yes, and he said he hid it under the bed. He said he would go and get it, so I followed him and he walked into the second bedroom and reached under the bed there and he pulled out the card board box which contained the money, the pay envelopes. He handed it over to me and I in turn handed it over to Detective Akana who was standing behind, beside me."

In the presence of the jury and while the Territory's witness, Leon M. Strauss, was on the stand, under direct examination, he testified to having first seen the defendant in his (witness') office, when Akana and Gunderson brought him in. After the witness had testified that he had questioned the defendant the following ensued.

"MR. DESHA: What did the defendant say in answer to your questions?

"MR. RIDLEY: Now then, if Your Honor please, I'll object to the question on the ground that it affirmatively appears from the evidence any statement that defendant may have made at the time were not voluntary. They were made under duress and undue influence, that defendant was not advised as to his Constitutional rights in any respect whatsoever, that

the defendant's rights guaranteed under the 4th, 5th, the 14th, 5th, the 6th, and 14th Amendments were violated, of the Constitution of the United States were violated and that the questioning was, took place under an illegal arrest, contrary to the provisions of Section 10701 to 10711 Revised Laws of Hawaii 1945.

"THE COURT: That's all?

"MR. RIDLEY: Yes.

"THE COURT: Your motion that the —

"MR. RIDLEY: I am objecting.

"THE COURT: Your objection as to defendant not being advised of his Constitutional rights is overruled. Your objection that he was not warned of his, violation of his Constitutional rights under the 5th, 6th, and 16th —

"MR. RIDLEY: 14th."

Specification of error number four is based upon the remarks and ruling of the court as follows:

"THE COURT: — Amendment is overruled. Your objection that there was an illegal arrest, and that the confession is inadmissable [sic] is overruled. The evidence so far adduced at this hearing, and the preliminary hearing, does not establish to the mind of this Court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. Court finds the statements were made voluntarily."

In the presence of the jury and while the Territory's witness Leon M. Strauss was on the stand and the prosecutor had concluded examination of the witness at that point, the following ensued.

"MR. RIDLEY: Before the witness leaves the stand, I would like to make a motion, Your Honor. I move to strike all the testimony of this witness, in

obtaining any statements given by the defendant on the ground it affirmatively appears from the evidence such statements were not given voluntarily. They were given under duress and undue influence and that the original arrest was illegal and the —

"THE COURT: One second —

"MR. RIDLEY: And the detention in the police station at the time that these alleged statements were taken continued to be illegal and not in conformity with Sections 10701 to 10711 inclusive of the Revised Laws of Hawaii 1945, that defendant was not advised as to his Constitutional rights and he was not advised that he was entitled to an attorney. He was not advised, also he was not advised that he could refuse to make any statements that he might make could be used against him, and on the further ground that the matter was illegal because police officers failed to take the defendant before a magistrate or to the City and County Jail.

"T H E  C O U R T: That goes to Section 10701 through —

"MR. RIDLEY: That is right. Specifically, I move to strike all of which tends to show, if Your Honor please, any statements given were given involuntarily."

Specification of error number five is based upon the remarks and ruling of the court as follows:

"THE COURT: The motion to strike because the defendant was illegally arrested is overruled. The motion to strike all the testimony because the detention was illegal pursuant to 10701 and 10711 is overruled. Motion to strike because the defendant was not advised of his Constitutional rights, because he was not advised he could get an attorney if he wanted one, because he was not advised that any statements he may make may be used against him, because he was not advised he

did not have to make any statement if he didn't want to, that motion is also overruled. Court finds the evidence so far adduced at this hearing, and at the preliminary hearing, does not establish to the mind of this court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. This Court finds the statement was made, both statements were made voluntarily."

In the presence of the jury and while the Territory's witness Daniel Stone was on the stand, had testified as to taking shorthand notes of an interview between Leon Strauss (the captain of police) and the defendant and to subsequently himself making a transcription thereof, an offer was made in evidence of prosecution's exhibit for identification number twenty-seven — which the witness Stone had testified was a transcription of his shorthand notes of the interview between Strauss and the defendant, to wit, questions asked by Strauss and answers given by the defendant — and the following ensued.

"MR. RIDLEY: Object to the admission of that document in evidence as Territory's evidence on the ground it affirmatively appears from the evidence adduced that it was not voluntarily given and it was given under, taken under duress and with undue influence. Defendant was not warned as to his Constitutional rights, he was not advised that he could refuse to make a statement if he so desired and was not advised any statement he might make could be used against him. The statement was taken at the time when defendant was under illegal arrest, was not taken before a magistrate or taken to the City and County Jail before taking any statement and all of which shows that the statements were not given voluntarily.

"THE COURT: How about the corrections?

"MR. RIDLEY: Which?

"THE COURT: Correctness of the statement?

"MR. RIDLEY: And on the further ground it is not a true reproduction of the shorthand notes as written and taken by him, and it is not a true reproduction of the statement as originally taken."

Specification of error number six is based upon the remarks and ruling of the court as follows:

"THE COURT: The objection to the, on the ground it is not a true reproduction of the statement given is overruled. To the objection that the defendant was not legally under arrest, that he was not taken before a magistrate and he was not served with any warrant prior to make [sic] this statement, that is overruled. The objection that the statement was made without informing defendant the statement could be used against him is also overruled. The objection that defendant was not warned he could refuse to make any statement if he so desired is overruled also. The fact there was no warrant of arrest prior to make [sic] the statement is overruled. So far as the objection that the statement was not given voluntarily, under duress, and undue influence, the Court finds that the evidence so far adduced in this hearing, and the preliminary hearing, does not establish to the mind of this court any such elements of compulsion as under the law will render the statement or confession involuntary. There has been no evidence of any force or any threats, any offers of immunity or hope of reward. The Court finds the statement was made voluntarily.

"MR. RIDLEY: May I assign Your Honor's —

"THE COURT: Wait one second. Therefore, Territory's Exhibit 27 for Identification is introduced in evidence and marked Territory's Exhibit 27."

▰▰▰▰▰▰▰

▰▰▰▰

Section 10123, R. L. H. 1945 (now section 231-23, R. L. H. 1955) reads as follows:

"Charge of court to jury; comment in criminal cases. The court shall instruct the jury regarding the law applicable to the facts of the case, and may, in a criminal case, make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case. It shall if requested inform the jury that they are the exclusive judges of all questions of fact and whether requested or not, the court shall so inform them if it comments on the evidence, the testimony or the credibility of any witness."

Section 9846, R. L. H. 1945 (now section 222-26, R. L. H. 1955) reads as follows:

"No confession shall be received in evidence unless it shall first be made to appear to the judge before whom the case is being tried that such confession was in fact voluntarily made and such voluntary confession, when offered in evidence on any trial, shall not be rejected merely because it was made on oath."

In making his rulings and incidental remarks, as *supra,* which are the bases of defendant's specifications of error numbers two, three, four, five, six, and seven — seven being as to denial of defendant's motion for a mistrial because of two to six, inclusive — the trial judge was exercising the discretion vested in him by the two sections of the statutes last above quoted and as he later, as *infra,* in his charge to the jury informed the jury that they were the exclusive judges of all questions of fact, no reversible error was committed by the rulings and incidental remarks aforesaid. See *Territory* v. *Joaquin,* 39 Haw. 221, 226; also, *People* v. *Briley,* 9 Cal. App. (2d) 84, 48 P. (2d) 734 (1935); 23 C. J. S., *Criminal Law,* § 992, p. 347; *State* v. *Jensen,* 66 N. W. (2d) 480 (Iowa, 1954); *State* v. *Fain,*

216 N. C. 157, 4 S. E. (2d) 319 (1939) ; *State* v. *Benham,* 118 P. (2d) 91 (Arizona, 1941) ; *State* v. *Tuttle,* 118 P. (2d) 88 (Arizona) ; *State* v. *Mishoe,* 198 S. C. 215, 17 S. E. (2d) 142 (1941) ; and *People* v. *Ottey,* 5 Cal. (2d) 714, 56 P. (2d) 193 (1936).

In this jurisdiction, the judge's role in the trial of a case is more than that of a referee. He has the duty to control all proceedings during the trial. It is so provided by section 10118, R. L. H. 1945 (now section 231-18, R. L. H. 1955) which reads as follows:

"Duty of court. It shall be the duty of the court to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the entire truth regarding the matters involved. The jurors shall apply to the facts the law as given to them by the court."

Conformably to the provisions of section 10123, R. L. H. 1945, quoted *supra,* at the conclusion of all of the evidence adduced and admitted in the case, the court in its charge to the jury included this:

"In considering the testimony in this case, you should not consider the statements of the attorneys that were made in presenting any objections or arguments upon any matter to the Judge of this Court during the course of the trial." "You will exclude from your recollection any remark that I may have made in passing upon any motion that was presented or in ruling upon any evidence in the case; disregard likewise any statement or argument of the lawyers if you believe they have mis-stated the evidence as you recall it falling from lips of the witnesses upon the witness stand."

The court also gave an instruction on the credibility of the witnesses and the weight of the evidence, as follows:

"The Court further instructs you, ladies and gentlemen of the jury, that you are the exclusive judges of the credibility of the witnesses, of the weight of the evidence and of the facts in this case. It is your exclusive right to determine from the appearance of the witnesses on the witness stand, their manner of testifying, their apparent candor or frankness, or lack thereof, which witness or witnesses are more worthy of credit, and to give weight accordingly. In determining the weight to be given the testimony of the witnesses, you are authorized to consider their relationship to the parties, if any, their interest, if any, in the result of this case, their temper, feeling or bias, if any has been shown, their demeanor, on the witness stand, their means and opportunity of information, and the probability or improbability of the story told by them."

Also, pertinent to alleged statements, confessions, and admissions by the defendant, the court gave an instruction as follows:

"In determining whether or not any statement, confession or admission was given or made by the defendant freely and voluntarily and without compulsion or coercive persuasion, you are instructed that you must entirely disregard the Court's rulings pertaining to the preliminary admissibility of any testimony and typewritten statements purporting to show any such statement, confession or admission, and you must entirely disregard the Court's remarks, or any inferences which you may have drawn therefrom, when the Court ruled upon any objections or motions relating thereto. After receiving this case for your deliberation, you are to be the sole judges as to whether or not you are satisfied from the evidence beyond all reasonable doubt that any such statement, confession or admission was made freely and voluntarily and without compulsion or

coercive persuasion. The Court's rulings or any remarks made by the Court when so ruling are not evidence and you must not be influenced by the same in any manner whatsoever.

"You are instructed that, before any statement, confession or admission can be considered by you as competent evidence for any purpose whatsoever, you must be convinced from the evidence beyond all reasonable doubt that the same was given and made by the defendant freely and voluntarily and without compulsion or coercive persuasion.

"If, from all of the surrounding facts and circumstances you are not convinced beyond all reasonable doubt that any such statement, confession or admission was given or made by the defendant freely and voluntarily and without compulsion or coercive persuasion, then you must reject such statement, confession or admission and not consider the same as evidence of any fact or facts whatsoever, but must arrive at your verdict solely upon the rest of the evidence or lack thereof."

Specification of error number eight is based on the overruling by the court of a motion on behalf of the defendant to dismiss the second count of the indictment, that alleging murder with "extreme atrocity and cruelty." The defendant has contended that there was insufficient evidence on that second count. The two counts of the indictment charge the same offense, a killing (1) with deliberate premeditated malice aforethought and (2) with extreme atrocity and cruelty. This was in accord with *Rep. Haw.* v. *Yamane,* 12 Haw. 189 (1899) and *Rep. Haw.* v. *Tsunikichi,* 11 Haw. 341 (1898). See also *Appl. of Palakiko and Majors,* 39 Haw. 141 (1951); *Palakiko, et al.,* v. *Harper,* 209 F. (2d) 75 (1953) and *Comm.* v. *Devlin,* 126 Mass. 253.

The trial court did not commit reversible error in over-

ruling the motion to dismiss count "II" of the indictment, for there was substantial and sufficient evidence to warrant submission of the case to the jury on both counts.

Police officer Herbert Chang, as a witness for the Territory, had testified in substance that on January 9, 1953, at about 12:59 P. M., he arrived at the scene of the alleged crime near the Moanalua golf course; that he there saw the victim, Earl Takao Fujita; that the latter was lying on his back, face up, his body parallel to the highway; he was unconscious but still alive. He was moaning and very feebly turning his body from side to side. There was a hole on the top of his head about two inches in diameter and as he moved there was a mass of red matter "that would come up slowly through the hole and go back down, almost in time with his breathing." The victim and his head "was smattered with blood."

Police Sergeant Daniel K. Toomey, who was also there with officer Chang, but arrived at the scene shortly after the latter, testified, as a witness for the Territory, that the victim "was all covered with blood on the face and the front portion of his clothing, face swollen, eyes closed, busted lips, big hole on the left temple region, also another semicircular hole under the left ear."

See also the testimony of Dr. Alvin Majoska as quoted *supra,* to the effect that the skull of the victim showed that the latter had been struck several times.

There was also additional visual evidence, such as prosecution's exhibit number seven, an enlarged photograph of his head wrapped in bandage and of the shoulders of the victim, Earl Takao Fujita; prosecution's exhibit number eight, an enlarged photograph of the left side of the victim's head taken at the city and county morgue; prosecution's exhibit number nine, an enlarged photograph of part of the top and left side of the victim's head; and

prosecution's exhibit number eleven, referred to in Dr. Majoska's testimony, *supra.*

Defendant's specification of error number nine is based on the refusal of the court to give defendant's requested instruction number "XXXV," which reads as follows:

"In determining whether or not any statement, confession or admission was made by the defendant freely and voluntarily and without compulsion or coercive persuasion, you may take into consideration all of the circumstances under which it was obtained including the nature and circumstances of his arrest, the fact that after his arrest the defendant was not advised that he was entitled to consult a lawyer, the fact that the defendant was not advised that he would not have to make any statement and that any statement made could be used against him whether the evidence does or does not disclose that any undue coercion or pressure was brought upon the defendant at the time when the statement, confession or admission was given or made and whether the evidence does or does not disclose that the defendant was in fear of its equivalent at the time the statement, confession or admission was given or made. You may also take into consideration the defendant's social and educational background, in so far as they have been disclosed to your satisfaction by the evidence, and any other evidence reflecting upon the defendant's intelligence or apparent state of mind at the time any such statement, confession or admission was given and made."

It appears from the transcript of the proceedings of the case that the trial court refused defendant's requested instruction number "XXXV" because it (the substance thereof) would be covered by other instructions which would be given. In fact, the court's charge to the jury included the following:

"You are instructed that, before any statement, confession or admission can be considered by you as competent evidence for any purpose whatsoever, you must be convinced from the evidence beyond all reasonable doubt that the same was given and made by the defendant freely and voluntarily and without compulsion or coercive persuasion.

"If, from all of the surround[ing] facts and circumstances, you are not convinced beyond all reasonable doubt that any such statement, confession or admission was given or made by the defendant freely and voluntarily and without compulsion or coercive persuasion, then you must reject such statement, confession or admission and not consider the same as evidence of any fact or facts whatsoever, but must arrive at your verdict solely upon the rest of the evidence or lack thereof.

"The admissions of a party, when proved may be evidence against him, and, although such admissions are to be taken together as a whole, the jury is not bound to regard all parts of them with equal confidence. The fact that they are against his interest, or in favor of it, their probability or improbability, consistency or inconsistency, contradiction or corroboration, by other facts in proof, are circumstances proper to be considered by the jury in determining the weight to be given to such admissions or to the several parts thereof.

"You are further instructed that the fact that the defendant was under arrest at the time he made a confession or that he was not at the time represented by counsel or not advised that he could have the aid of counsel or that he was not told that any statement he might make could or would be used against him or that the police officers did not warn him of his constitutional rights will not necessarily render such con-

fession involuntary, but may be considered by you in conjunction with all the facts in evidence in determining whether the confessions were in fact voluntarily made."

In view of the foregoing, no reversible error was committed by the trial court in refusing to give the defendant's requested instruction number "XXXV."

Defendant's specification of error number ten lacks the specificness required to present to this appellate court for consideration and determination wherein or wherefore "the verdict of the Jury, and the findings of the Court based thereon are contrary to the law, the evidence and the weight of the evidence" as alleged by the defendant.

Defendant's specification of error number eleven is repetitious of other specifications of error hereinbefore commented upon and disposed of, excepting as to the paragraph thereof numbered "24." The latter paragraph is to this effect:

"That the Court erred in refusing to give Defendant's requested Instructions number I, II, III, XVI, XVIII, XXX, XXXV, XXXVI, XXXVII, XXXVIII, XXXIX, XLI, XLII, XLIII."

However, with respect to the alleged error as to refusal to give defendant's instruction number "XXXV," that was made a separate specification of error, "IX," and has been commented upon and disposed of *supra*.

As to the alleged error in the trial court's refusal to give the others of the defendant's instructions numbered as above, the defendant has presumably waived any alleged error in the failure of the trial court to give the same, for he has presented no argument thereon, either in his opening brief, or orally, Further, sub-paragraph "(4)" of RULE 3 of this Supreme Court provides, *inter alia,* that:

"* * * When the error alleged is the charge of the court, the specification shall set out the part referred

to *totidem verbis,* whether it be in instructions given or in instructions refused, together with the objections urged at the trial."

Defendant's specification of error number twelve does not properly present any matter for consideration and disposition by this appellate court, it being to the effect that the "Circuit Court erred in passing sentence upon the Defendant in that the verdict of the Jury was contrary to the law, the evidence and the weight of the evidence and Defendant's motion for a new trial should have been granted." Sub-paragraph "(4)" of RULE 3 of the rules of this Supreme Court, which is referred to *supra,* in addition to the portion thereof above quoted, also contains this provision:

"* * * In all cases, when findings are specified as error, the specification shall state as particularly as may be, wherein the findings of fact and conclusions of law are alleged to be erroneous. * * *"

Nevertheless, in this court there has been a careful reading of the entire transcript of evidence and proceedings in the trial court and an examination of all of the exhibits received in evidence.

Summarized, the evidence was as hereinafter recited.

On January 9, 1953, about 12:30 P. M., Sergeant Arthur Gilmore was playing golf with an army friend at the Moanalua golf course in Honolulu. While walking from the fifth green to the sixth tee he heard a "moaning sound," coming from the vicinity back of the sixth tee. After teeing off he turned around and looked down in the brush back of the sixth tee towards the highway and "saw a man kneeling over some leg that was sticking out behind the bush." Sergeant Gilmore observed a man with bushy, black hair squatting over the leg and swinging his right hand side ways in front of him. Sergeant Gilmore also saw two automobiles at the scene, one blue and the other tan. After

calling the greens' keeper who was working down the fairway, Sergeant Gilmore and his friend went to the scene of what he had observed and upon arrival there saw a man lying on the grass, who had a hole on, or in, the side of his head and whose whole face was swollen. That man was still moaning. Sergeant Gilmore noticed that the man with the black, bushy hair was gone; also, the blue car was gone. He told the greens' keeper to go back to the clubhouse and summon an ambulance and the police. He remained at the scene until the police and an ambulance arrived. Officer Herbert Chang was the first police officer to arrive at the scene. He reached the scene at about 12:59 P. M., went into the bush area and there saw the person lying on the ground about forty feet mauka of the Moanalua highway. The wounded man was unconscious but still alive and moaning feebly, turning his body from side to side. Officer Herbert Chang noticed that the man on the ground had a hole, about two inches in diameter, on, or in, the top of his head and that a "mass of red matter would come up slowly through the hole and go back down, almost in time with his breathing." Shortly thereafter other police officers and an ambulance arrived.

Dr. Thomas Minn, a physician with the city and county emergency hospital, arrived at the scene on an ambulance, shortly after one o'clock. He found the wounded person unconscious and in an extremely critical condition. He observed "a very large wound on the left forehead and temple area which had crushed the bone and penetrated into the brain cavity. There was evidence of macerated brain tissue in the wound itself." While transporting the wounded person to the emergency hospital, Dr. Minn administered oxygen but upon arrival at the hospital the wounded man expired at 1:35 P. M. The deceased was taken to the city and county morgue by assistant coroner George Pacheco and was there, by one Hideo Higa, office

manager of Higa Trucking Company, identified as Earl Takao Fujita. Dr. Alvin Majoska performed a partial autopsy on the body of Earl Takao Fujita at 3:30 P. M., January 9, 1953. Dr. Majoska's testimony has been set forth *supra* and is incorporated herein by reference thereto.

The testimony of Sergeant Arthur Gilmore, officer Herbert Chang, Dr. Thomas Minn, assistant coroner George Pacheco, identification of the victim by Hideo Higa and the testimony of Dr. Alvin Majoska, were quite adequate to establish the corpus delicti.

At about 5:15 P. M. on January 9, 1953, pursuant to oral instructions from Captain Leon Strauss, of the Honolulu police department, two of the department's detectives, George Akana and Leonard Gunderson, went to the home of the defendant at 1003 North Vineyard street and detective Gunderson there arrested the defendant. The testimony given by the two detectives, severally, including incriminatory statements made by the defendant, as recited *supra,* are referred to and so incorporated herein. It will be noted that while they were at his home the defendant produced from under the bed a cardboard box containing the payroll of the Higa Trucking Company, which had been entrusted to Earl Takao Fujita, the victim of the bludgeoning.

At about 6:42 P. M., on January 9, 1953, a stenographic statement was taken from the defendant by Captain Strauss, with detectives Akana and Gunderson and police reporter Daniel Stone present. Testimony was that at that time no threats, force, or promises of immunity or offers of reward were made. About 8:40 P. M., the same night, a voluntary supplementary statement was taken from the defendant by Captain Strauss.

At about 10:40 A. M., on January 10, 1953, the defendant was taken to the scene of the alleged crime and there reconstructed his activities of the previous day. On the

way to Moanalua golf course, the defendant was taken to Vineyard and Kohou streets where the defendant's brother, in defendant's presence, pointed to a bundle underneath the grass. Among other things, in this bundle was a Pietro Barretta pistol (prosecution's exhibit number twenty-nine), which the defendant admitted to Captain Strauss to be the same pistol with which the defendant committed the assault on Earl Takao Fujita the previous day. Also recovered at Vineyard and Kohou streets was clothing admitted by defendant to be his. Defendant then directed the police officers to go to Hart and Waiakamilo streets, where he said he and his brother Robert had waited for Earl Takao Fujita. Thence they went to Nimitz and Mokauea where, according to the defendant, Fujita was flagged down and questioned by the defendant about the payroll. Thence, directed by the defendant, the police officers took him to the scene of the alleged crime near Moanalua golf course, where the struggle took place. Thereafter the defendant showed the police officers the route he took to reach his home on 1003 North Vineyard street.

Of the four persons who were sworn and testified as witnesses on behalf of the defendant the first, O. P. Soares, an attorney at law since 1920, practicing in and before all the courts of the Territory, testified that he saw the defendant on January 10, 1953; visited him "In the cell block as it is called of the Police Station in Honolulu." He, the attorney, had heard about the alleged killing of one Earl Takao Fujita and had been asked by defendant's father, who was a boyhood friend of the attorney, "* * * to represent them, his son at that time, his sons." While he was on the stand, under direct examination, questions put to and answers given by attorney Soares were as follows:

"Q  And where did you visit the defendant?

"A  Police station, as I say, I believe in the cell block, at a table in the cell block.

"Q Was that on the 10th, January 10th, or can you fix the date? Was it before or after the defendant had been taken into custody?

"A He was in custody when I first entered.

"Q Can you fix it relative to the time of the crime?

"A Yes, shortly after he had been taken into custody in connection with this crime described in this indictment.

"Q You say it was after the day?

"A That's my best recollection.

"Q And where did you visit the defendant?

"A In the cell block, Honolulu Police Station.

"Q And approximately what time?

"A I have no independent memory or recollection. I believe it was in the very early morning, early for me at least.

"Q Did you talk to the defendant?

"A I did.

"Q And do you know when you visited the defendant that morning, whether it was before or after he made any, signed any statements?

"A I have no independent recollection of that fact.

"Q All right, did you advise the defendant as to these various Constitutional rights that morning?

"A I most certainly did.

"Q What did you advise him? Did you advise him whether or not he was to answer any questions?

"A I told him very vehemently he was not to answer any questions, not even so much as to say what his name is, and above all, that he was to sign no statements.

"Q Did the defendant understand what you said?

"A I believe he did, he appeared to.

"Q How long were you with him?

"A I should say 10, 15 minutes at the most.

"Q So you had a chance to completely emphasize that?
"A No question about that. I didn't leave him until I was satisfied he understood what his Constitutional rights were and what my advise [sic] as his counsel was. I might add, I had no difficulty in making him understand that.
"Q Can you fix the time of morning a little bit more definitely, that you were there?
"A I'm sorry, I can't, Mr. Ridley, but probably it will be between 9 and 10 in the morning. It is my recollection. I made no note of it at the time or the occasion.
* * * * *

"Q In response to your advice, did the defendant indicate whether or not he, what he intended to do?
"A He indicated that he would follow my advice. He said so in just so many words."

(Mrs.) Katie Josiah, the second person sworn as a witness on behalf of the defendant, testified to the defendant being her son, to being present at their home when detectives Akana and Gunderson called there on the evening of January 9, when the defendant was arrested. She was asked, "Did you invite them into the house?" To which she responded, "I did." She further testified in substance that the arrest of the defendant had been made as detective Gunderson had stated in his testimony, also that she had asked her son, the defendant, what had happened but that the latter did not respond or say anything or talk at all while the detectives were there. However, on cross examination, she said she saw her boy, the defendant, go into the bedroom and come out with a box, which he gave to Gunderson, but did not know or hear mentioned what was in the box. Upon redirect examination and without objection from the prosecution, Mrs. Josiah, the defendant's mother, testified that he was born in Honolulu in the year of 1923, lived here all his life; first went to school

at Kauluwela school for about two years, "something like that. I don't know, it's been so long." Then he went to Likelike school for about three or four years; then to the boys' industrial school. He did not have any further schooling after he came out of the boys' industrial school, but went to work for the U. S. E. D. Just before the case took place, he had been working at Higa Trucking Company and had been working for Higa for five or six years.

As to his character she testified:

"Q Now, during all that period of time, did anybody accuse Joseph in your presence or state to you Joseph was dishonest?

"A No, he was always a good boy to his wife and his family. His wife was getting all kinds of bills and piling up. *I guess that's where all the trouble came in.*" (Emphasis added.)

The third and fourth witnesses for the defendant merely testified as to the character of the defendant and his reputation prior to January 9, 1953.

It may be assumed — and the jury could well have found — from the testimony of attorney O. P. Soares, quoted *supra,* that he saw the defendant at some time between nine and ten in the morning on January 10, 1953, and advised the defendant fully of his constitutional and legal rights and the defendant was thus advised accordingly prior to 10:40 A. M. on January 10, 1953, when, according to testimony of Leon Strauss, witness on behalf of the Territory, the defendant was taken to the scene of the alleged crime and on the way and there reconstructed his activities of the previous day and told of his part of the waylaying and killing of Earl Takao Fujita and the taking of the payroll money of which the latter had had custody.

After giving full consideration to all of the defendant's specifications of error and disposing of them as *supra,* we, upon the entire record in this case, conclude that the de-

fendant not only had a fair trial but the evidence abundantly sustains the verdict of the jury.

Affirmed.

*Daniel G. Ridley* (*James Y. Shigemura* with him on the briefs) for plaintiff in error.

*Takashi Kitaoka,* Assistant Public Prosecutor (also on the brief), for defendant in error.