E. N. JACKSON v. STATE.

No. A-9531. Oct. 6, 1939.

(94 P. 2d 851.)

John M. Goldesberry and Gerald B. Klein, both of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Judson H. Pierce, Co. Atty., of Perry, for the State.

BAREFOOT, J. Defendant was charged with the crime of murder in Noble county; was tried, convicted and sentenced to the penitentiary for life, and has appealed.

Defendant was charged with the crime of murdering Carl Swart, his son-in-law, in Perry, Noble county, on

the 25th day of June, 1937. The defendant and his wife resided at 725 Grove Street, in the city of Perry. The killing occurred in the street just in front of defendant's home. The facts, as shown by the record, revealed that deceased had married the daughter of defendant about eight years prior to the time of the homicide. That he and his wife were the parents of three children, all girls. That he had lived in the city of Perry during that time. That defendant and his wife resided in Collinsville and Three Sands, and that about two years prior to the homicide, they had come to Perry, at the request of deceased and his wife. That the daughter had been sick, and they came to help her and assist in taking care of the three children. That for some time they lived in the home of deceased, who had a business in Perry. Afterwards, and at the time of the homicide they were living at 725 Grove street. There had been some estrangement between deceased and his wife, and the defendant and his wife had possession of the three children on the date of the killing, June 25, 1937.

The eyewitnesses to the killing were the defendant, his daughter, the wife of deceased, who did not testify in the case, and three ladies, who testified for the state. These witnesses were Mrs. Daisy Hayes, Mrs. Ted Mullica, and Helen Mosena. Mrs. Mullica lived directly opposite, and on the south side of the street from where defendant resided. Mrs. Daisy Hayes worked for Mrs. Mullica, and Helen Mosena worked for Mr. and Mrs. H. L. Johnson, who resided on the south side of the street, and the second door east of the Mullica residence.

Mrs. Hayes was sitting near the front door at the time of the killing. She saw all of it, and Mrs. Mullica came to the door, and saw practically all of it. Helen Mosena was working in the yard during the afternoon, and witnessed all of the events leading up to the killing of deceased by defendant.

The testimony of Mrs. Daisy Hayes was, that she had been to town in the forepart of the afternoon, but returned about 4:00 p. m. That she was sitting looking out at the door and rocking the baby when she saw a Chevrolet pick-up drive up in front of the home of the defendant, E. N. Jackson, between 5:30 and 6:00 o'clock, on the evening of June 25, 1937. That she did not notice anyone get out of the car, but that in a very short time she saw the wife of deceased and defendant come out of the front door of defendant's home. That there was an apparent scuffle between them, and defendant proceeded toward the automobile in which deceased was sitting in the street, and near the curb. That defendant was walking fast. That he went to the right hand, or north side, of the car opposite where deceased was seated. That he leaned over into the car, but did not get into same. As he leaned into the car his daughter took hold of him and he jerked away. That he then went to the front of the car and to the west around the hood of the car, and was standing just to the right of the left front wheel. That deceased got out of the pick-up backwards and with his left side toward defendant, and looked as though he was having trouble shutting the door of the car. Just as deceased got out of the car she saw defendant raise his hand and shoot deceased with a pistol which he held in his hands. She saw the shot hit deceased, and saw his left hand fall limp. The deceased then started toward the back of the pick-up, with his back turned toward defendant, and she saw defendant fire the second time, and defendant began to fall. Another shot was fired after defendant had fallen. She could not say whether four shots were fired. There might have been two of them close together. She did not see the deceased with anything in his hand, nor did she see him make any demonstration of any kind toward defendant, and did not see him start toward defendant. She saw the body of deceased, which was about twelve feet from the back of the Chevrolet pick-up and

to the east. It was lying on the side with his head to the north near the parking. She saw the wife of deceased go to the body and pick him up and place him on his back. She also saw some party pick up the iron bar, about four feet long, and which was used as a tool to take tires from automobile wheels, lying near the body of deceased.

The testimony of Mrs. Hayes was corroborated almost in every detail by Mrs. Mullica. She was sitting in the same room with Mrs. Hayes, and when her attention was called, she went to the front door and witnessed all of the difficulty. She witnessed the shooting, and saw no demonstration of any kind by the deceased. She saw defendant fire the first shot that struck deceased in the left arm, and then saw two shots in rapid succession while deceased had his back to defendant and was attempting to get away to the east. She heard deceased say: "My God, give me a chance."

Helen Mosena was standing in the yard about 2:30 p. m., on the date of the homicide, changing the water. She saw a Chevrolet pick-up drive up in front of the Jackson home and stop. She saw the wife of deceased get out of the car and go into the house and stay a few minutes, and return and get in the car and they drove away. She was again in the yard changing the water when the same pick-up drove to the front of the house and stopped between 5:30 and 6:00 p. m., on the same date. She saw the wife of deceased get out and go into the house and in a few minutes saw defendant come out of the door and in a fast walk or run go toward the car. She thought defendant got into the car on the right or north side, but she saw him walk around the hood of the car to the west, and saw deceased get out of the car, and saw defendant shoot deceased with a pistol. She testified that deceased was running away from defendant at the time the shots were fired, and that he had his back to defendant. She did not see anything in the hands of

deceased, and did not see any demonstration of any kind on his part toward defendant. She did not go to the scene of the difficulty at any time.

Fred Peden, a police officer, answered a telephone call, and arrived at the scene of the difficulty a very few minutes after the shooting. He saw the body of deceased, and it was lying on its back in the street about 12 feet from the back of the pick-up, with his head to the north just resting on the edge of the parking. He saw a piece of iron about four feet in length, that was used to take casings from automobile wheels laying by the side of the deceased. He immediately went into the house of defendant, and told him it would be necessary for him to go with him to jail. That defendant was changing clothes. That he asked defendant for the gun, and that defendant went to a dresser drawer and got the same and gave it to him, and that he delivered the gun and the defendant to Deputy Sheriff De Vilbiss, who had come to the scene of the difficulty. The iron bar was also delivered to the deputy sheriff. Defendant was immediately placed in the county jail.

Deputy Sheriff De Vilbiss testified to the general surroundings, and to seeing the body of deceased lying in the street, and seeing the iron bar lying by the side of the body of deceased. He also testified that the gun had four empty shells in it that had been fired, and two that had not been fired. One of these had been snapped and had failed to fire.

A plat drawn by an engineer showing the proper location of the premises was introduced in evidence.

Certain photographs which were taken subsequent to the killing were offered in evidence, but excluded by the court.

The undertaker, Mr. Bernhart, and Dr. Driver testified as to the location of the wounds on the body of

deceased. They did this by illustrating on the body of the county attorney, and from the record it is hard to state the exact locations. But from their testimony it is shown that one of the shots entered the left arm, and was found in the center of the chest. Another entered the left side of the body, and came out on the opposite or right side. One entered under the right shoulder blade. Its location or exit was not shown.

The defendant testified that he had lived in Oklahoma for more than 40 years. That he had been a farmer, stock raiser, and in the cattle business until 1920, when the crash broke him. That he was married and had two children, a boy named John, and a girl named Zella, who had married deceased, and that they had three little girls. That he and his wife moved from Collinsville to Perry at the request of deceased and his wife, principally to be with and help take care of his daughter and her children. That he worked at anything he could get to do. That he had been working for a Mr. Leatherock from the 15th of March to the date of the killing. That on that date his daughter, the wife of deceased and her three children were staying at his home, and had been there for a couple of weeks. That about 2 or 3 p. m. he received information by telephone from Mrs. Miller, a neighbor, that deceased was at his home and that his wife desired him to come home. That he went immediately but he had left. That he returned to his work and came home a little after 5 o'clock, and went to the grocery store, and when he returned home, and while his wife was preparing supper, the deceased drove up in his Chevrolet pick-up in front of his home. That he saw his daughter get out of the car and come into the house and she was talking to her mother. That he was watching deceased, and that he walked to the dresser behind the door and took the gun out of the dresser drawer, and put it in his pocket, and walked out to the car. That he walked up to the north side of the car, and the door was standing

wide open. That he said to deceased: "Carl, I told you and told you time after time I wanted you to stay away from here," and that deceased said: "I will come up here whenever I want to," and started to get out of the car on the south side, just backing out. That he had his hand under the cushion as he was getting out, and that he thought he was going to get a gun, and that he immediately went to the front of the car thinking if deceased shot that it would not go toward where his family was. That deceased had gotten out of the car when he got past the car, and was coming toward him with the tire tool raised in his hands, and that he then shot deceased. That deceased was within four to six feet of him with the tire tool raised in his hands, and that he shot him to keep deceased from striking him. That he did not know how many shots were fired. That during the time of the shooting deceased was between the car door and the back of the car. That he did not fire any shots into the body of deceased after he fell. That during the shooting deceased was facing him most of the time. That he did not shoot deceased in the back intentionally. That after the shooting he went back to his house, put his gun back in the dresser drawer, and asked his wife to call the law, and when they did not come immediately he went over to Mrs. Miller's house and called himself. That he then went back to his home and changed his clothes, and when the police officer arrived he gave him the gun, and went with the deputy sheriff, De Vilbiss, to the county jail.

Mrs. E. N. Jackson, wife of defendant, testified. She did not see any part of the real difficulty. She testified to the deceased coming to the home at 2 p. m., on the date of the killing, and that she requested Mrs. Miller to phone her husband. That he came home and she told him of deceased having been there. She also testified as to the treatment of her daughter by deceased, and of defendant having on several different occasions warned

him not to come there. That she saw defendant as he was coming to the house after the shooting, and that she observed the tire tool by the side of deceased.

Several other witnesses testified to minor details, and to seeing the iron bar lying by the side of deceased.

About seven witnesses testified to having heard deceased make threats against defendant to the effect that he would kill him or do him bodily harm, some of which were communicated to defendant, and some that were not.

Counsel for defendant have prepared and filed an able and elaborate brief containing 134 pages. Twenty-nine assignments of error were presented in the motion for new trial. Some have been abandoned, others may be grouped and considered together. Every statement of the county attorney, the trial judge, and the admission or rejection of evidence has been closely contested. It would extend the opinion in this case to an undue length if every item was considered. Many of the assignments of error are so technical it is unnecessary to review them.

We have carefully read the briefs, the case-made, and it becomes necessary, under the law, to look at this case in a general way, and to take into consideration all of the facts and circumstances surrounding this homicide, to come to a correct conclusion, and not to look to some one circumstance or action that may have occurred in the trial thereof.

In the first error assigned it is contended that the action of the county attorney was cause for reversal. Many different acts are complained of. It is contended that in the opening statement of the county attorney that he referred to deceased as follows: "That he has been raised up in Noble county; has been in business for a great number of years, has always been a peaceable law abiding citizen." In the first place the opening statement of the county attorney is not evidence in the case,

as has often been held by this court. Shacklett v. State, 23 Okla. Cr. 4, 211 P. 1063; Guest v. State, 56 Okla. Cr. 129, 34 P. 2d 1082. In the second place, when counsel for defendant objected the court sustained his objection. Under the circumstances there was no error. It is claimed the county attorney and special prosecutor asked questions out of time and when counsel for defendant was questioning witnesses. This was clearly within the discretion of the court, and we find no abuse of discretion.

In the trial of the case counsel for the state attempted to introduce certain pictures which had been taken subsequent to the homicide. Many questions were asked of different witnesses in an attempt to lay a predicate for the introduction of the pictures. They were finally excluded by the court for the reason that the body of some one had been placed in the street behind the truck, and the court would not permit them to be introduced. We find nothing in the record to prejudice the rights of the defendant.

While the defendant was on the witness stand he was asked by counsel for the state if he had not made the statement to one A. E. Barnes: "I have a notion at times to go down and kill him." The defendant denied making the statement, and the state did not place the witness Barnes upon the witness stand. The record reveals that the name of the witness, A. E. Barnes, was served upon the defendant prior to the trial. It does not disclose why he was not placed upon the stand. No bad faith is shown by the state. While we think that it is improper for the state to ask this question and fail to place the witness upon the stand to whom it was said, if available, yet it is not such an error as to cause a reversal of this case in view of the record herein.

Also, upon cross-examination, counsel for state asked defendant if at the time of the difficulty, if his daughter did not say to him: "My God, what have you done, you

are a murderer." We do not think this was such error as to cause a reversal of this case. The same rule applies to this question as to the one heretofore stated, and we do not think that this was such error as to cause a reversal.

Many other minor questions are raised as to questions asked the defendant on cross-examination. Most of these are wholly without merit, and with reference to matters which were immaterial, and from a review of the whole record were not prejudicial to defendant's rights. Special reference is made to the cross-examination of defendant, with reference to a certain statement made by him, in writing, to the county attorney, soon after the difficulty. We have carefully examined the record and do not find any substantial error in reference thereto.

It is also complained of the closing argument of the county attorney where he referred to "rattlesnakes and copperheads." The court sustained an objection to this argument and instructed the jury to disregard and not consider the same. We do not find any error in this.

It is next assigned as error certain rulings of the court during the progress of the trial. While defendant was a witness in his own behalf, he was asked why he moved from Collinsville to Perry, and the court sustained an objection to this question. It was wholly immaterial as to the facts in this case. The court permitted his wife to testify to these facts and was clearly before the jury as to why they moved to Perry.

There was much testimony attempted to be offered as to quarrels and bickering and family disturbances between defendant and his wife and deceased. Also as to the treatment of the wife of deceased by him. Much of this testimony was permitted to be introduced. Much of it was excluded as immaterial. We have carefully examined the record, and do not find any substantial error in excluding the testimony offered by defendant.

As the trial court stated:

"* * * Assuming all of the things mentioned in the offer of the defendant are true, it would do no more than to establish that there was ill feeling between the defendant and the deceased, and that is already in evidence; that is, that there was bad feeling between the defendant and the deceased for some time prior to and up to the time of the fatal difficulty."

It is next urged that the court erred in certain statements made at the trial, and in commenting on the evidence to the prejudice of defendant. In the trial of the case the witness Mrs. Daisy Hayes was asked:

"You have no personal interest in this case one way or the other?"

It is seriously contended by counsel that this question alone should cause a reversal of this case, because no reference had been made that she had a personal interest.

This is clearly without merit as are many of the objections and exceptions of counsel for defendant.

In this case, as heretofore noted, there were three lady witnesses for the state, who were eyewitnesses. During the trial, one of these witnesses was being asked as to her best judgment as to a certain distance, as follows:

"Q. Well, we are entitled to have your best judgment about it. I will ask the court to instruct you to give us your best judgment. The Court: In the first place, it is a matter of common knowledge in court circles and has been my observation, that no lady witness can give time or distance, and I don't like to force them to try to do so. Now, she has described how it happened, and—you know the difference between a second and a minute? A. Yes. Q. A minute is a long time under circumstances like we have talked about? A. Yes. Q. With that in mind, can you tell the attorney in response to his question how many seconds it was? A. No, I couldn't. Mr. Goldesberry: I want to respectfully except to the statement of the court with reference to the court's experience with lady

witnesses, as being prejudicial to the rights of the defendant. The Court: You may have an exception, I would like for the Supreme Court to pass on that; it is such a well-known thing among lawyers and judges, I would just like to know if the Supreme Court would criticize this court for that expression. Mr. Goldesberry: All the object I had was just trying to get the facts. The Court: I know what your object is, you don't have to explain it at all, and I sometimes engage in a little humor in a trial, I claim that privilege; to break the monotony of the trial I sometimes engage in a little humor and it was more or less humor involved in that, yet I stand on that proposition."

It is seriously contended that this was such error as to cause a reversal of this case. It is so patent on its face that this was not error that the court should not discuss it, but merely to show the contentions made for a reversal of this case. Many similar objections and exceptions are urged, but we consider it unnecessary to refer to them.

As before stated, we have carefully read the record and briefs in this case. The trial court was exceedingly fair to the defendant during the trial. If there was any doubt in his mind as to the admission of evidence the defendant was given the benefit of the doubt and the evidence was permitted to go to the jury. It is true that there were some discrepancies as to how different witnesses saw this difficulty, but there is no substantial difference in the testimony of the eyewitnesses, except that the witness Helen Mosena testified, in her opinion the deceased was running away from defendant at the time all of the shots were fired. These were all proper questions for the jury, under proper instructions of the court. It is universally known that all parties do not see difficulties in the same way.

The testimony of the state was such that if believed by the jury, and they evidently did believe it, defendant was guilty of murder. It is for this court to say from

the record in this case that the jury was mistaken. The jury heard defendant's statement, the evidence of his witnesses, and especially his witnesses as to good character, and those who testified as to threats of deceased toward him. After hearing and seeing those witnesses, and taking into consideration the physical facts, and the witnesses offered by the state, they found the defendant guilty of murder and assessed his punishment in the penitentiary for life. Under the law and the facts this judgment cannot be set aside by this court.

Defendant has excepted to certain instructions given by the court. No requested instructions were asked. We have carefully examined the instructions given in this case. They are exceptional, and cover every phase of the law and protect the rights of the defendant in every respect. It is unnecessary for them to be discussed in detail.

For the reasons above stated the judgment of the district court of Noble county is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.