STATE OF HAWAII *v.* JOSE R. MOLINA.

No. 4349.

MARCH 6, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY MIZUHA, J.

Defendant-appellant, Jose R. Molina, was indicted, tried and convicted of committing murder with extreme atrocity and cruelty, which is murder in the first degree.

Defendant's first specification of error presents for review the sufficiency of the evidence to justify a conviction of murder committed with extreme atrocity and cruelty.

On the night of the killing, defendant, 22 years old, drove his car to the residence of Yotaro and Chiyono Fujino with the intent of committing a burglary. Defendant climbed to the second floor and broke into the house. In the upstairs rear bedroom, he discovered the victim, Chiyono Fujino, asleep in bed.

Defendant confessed "I never like hit her if I didn't have to. So I guess I woke her and tried to tie her up but she didn't stay down. That's when I first hit her on the jaw, I guess, and some place on the face and she still kept coming up so I hit her again and she grabbed hold of me. She wouldn't let go of me so I tried fighting her off. She kept on holding. * * *" According to this confession, she grabbed him and would not let go. Molina then put her in a headlock and took out his brass knuckles. With the brass knuckles on his hand, he hit her on the head four or five times. After all these blows, she was bleeding quite freely from around the nose and head. Molina admitted

that because of all the blood, he thought "she was dead."

At the trial, the attending doctor, Dr. Lee, testified that when Mrs. Fujino arrived at the Emergency Hospital, she was still bleeding from the nose and the head. He testified that "there were four lacerations or four cuts on the scalp," and that "another striking thing that was present was a large hematoma, or, in other words, a large black and blue spot was present over the left eye," which resulted in the closing of that eye. After X-rays were taken, Dr. Lee had to suture her scalp to prevent further loss of blood.

Dr. Lee was resummoned to the hospital at approximately 6:00 A.M. the following day. Mrs. Fujino had stopped breathing. He then called Dr. Bennett, a neurosurgeon, into the case. Dr. Bennett testified: "The patient was unconscious. The right pupil was dilated. There was —there were increased reflexes on the right side, diminished reflexes on the left side, and the patient was in deep coma—completely unconscious. There were injuries about the head and face. There were sutured lacerations on the scalp * * *." He also testified: "she was breathing by means of an artificial respirator with a tube into the trachea, the windpipe, which was connected to the respirator machine. The left eye was swollen shut * * * X-rays that had been taken earlier showed a long linear, a straight line fracture in the left frontal temporal and parietal region above the ear. And also it was my impression that she had hemorrhaged within the cranium, the skull, as a result of her injuries." The length of the linear fracture shown on the X-rays was "about 6 or 7 inches" long.

As a result of these findings, Dr. Bennett performed a craniectomy on Mrs. Fujino. He testified: "A 12-centimeter incision in the left temporal region—about where my—between my fingers (indicating)—was carried into the cranium. An opening was made into the cranium. A

fracture line was seen in the upper part of the incision, going from front to back. A small amount of blood, 10 to 15 CC's—about a tablespoon or more—was encountered outside the dura, the tough membrane that lines the inner side of the skull and covers the brain. There was considerable increase of intracranial tension or pressure; and on making a small opening into the—through the dura, dark blood of venous type was encountered. About 100 cc's escaped, at which time the brain was about a half inch inside the dura. But shortly the brain began swelling. There was more blood, again of venous type, and the opening into the cranium or skull was enlarged to a size of about 2 by 3 inches. A dural flap was turned, making an opening into the—through the dura, exposing more of the brain but it was impossible to stop the brain from swelling and brain tissue was expelled through the opening in the dura. Softened brain tissue was removed by suction and still it was impossible to close the dura. There was no bleeding at the time of closure. This acute swelling of the brain persisted, and the scalp was closed with two layers of sutures. The patient's condition remained unchanged. She still did not breathe on her own and was continued on artificial respiration."

Two days later she died. Dr. Majoska, who performed the autopsy, testified: "* * * she had multiple evidences of bruises, scrapes and cuts. These were due to violence. * * * There was a slight amount of bleeding outside of the principal membrane surrounding the brain. There was a moderate amount of free blood between this membrane and the brain. These two findings were due to violence. There was a comminuted fracture of the left side of the skull. * * * There was marked bruising of the brain. There was marked swelling of the brain. And there was moderate laceration or cutting, tearing of the brain. And the basis of these findings, particularly in the skull—the

cause of death was certified to as being cerebral contusion and laceration due to trauma; in lay terms, bruising and either cutting or tearing of the brain due to violence."

All the doctors testified that it would take considerable force to fracture the skull and that the injuries could have been inflicted by some blunt instrument, as, for example, brass knuckles.

R.L.H. 1955, § 291-3 (Supp. 1961), reads as follows: "Murder committed with deliberate premeditated malice aforethought, or in the commission of or attempt to commit any crime punishable with imprisonment for life not subject to parole, or committed with extreme atrocity or cruelty, is murder in the first degree."

"* * * Our statute does not create distinct offenses of murder in the first degree, but one offense, one crime, which may be committed by any of the means described in the statute which, if proven, constitute the same felony. It is the same transaction." *Republic of Hawaii* v. *Yamane,* 12 Haw. 189, 201.

In two early cases, *Republic of Hawaii* v. *Tsunikichi,* 11 Haw. 341, and *Republic of Hawaii* v. *Yamane, supra,* defendants were tried for murder in the first degree under two counts: premeditated murder and murder committed with extreme atrocity or cruelty. In each case, the trial court denied defendant's request that the prosecution elect the count upon which they would proceed and the facts were presented to the jury on both counts. The trial court's ruling was upheld in both cases. In neither case was the jury called upon to indicate the count upon which the defendant was convicted. However, in the *Tsunikichi* case, *supra,* this court commented that the evidence authorized the jury to find the defendant guilty under either count or both.

In the *Yamane* case, *supra,* this court approved the following instruction:

"* * * Deliberate, premeditated malice, or else extreme atrocity or cruelty must be proved by the evidence in order to justify a verdict of murder in the first degree. It is not necessary in order to convict the defendants of the murder of Chew Foon Wing with extreme atrocity or with extreme cruelty to prove that the weapons used in committing the murder were, or that the manner of committing it was, the most atrocious or the most cruel possible; but the crime must have been committed with atrocity or with cruelty of a higher degree than is usually incident to murder." *Republic of Hawaii* v. *Yamane, supra* at 209.

This instruction was also approved by Justice Le Baron who denied a petition for a writ of habeas corpus presented to him as an individual justice in *Application of Palakiko and Majors,* 39 Haw. 141, 149. Subsequently, this court adopted what had been said on this subject in the *Application of Palakiko and Majors,* 39 Haw. 167, which was affirmed *sub nom., Palakiko* v. *Harper,* 209 F.2d 75,[1] *cert.*

---

. 1 "Application of Palakiko and Majors, 39 Haw. 148-150: 'It is further significant that the provision in question has been a part of the statutory law of this Territory since 1890 (see L. 1890, c. 72, § 2a) and presumably was adopted from the State of Massachusetts, which has had an identical provision on its statute books since 1858 (see Laws of Mass. 1858, c. 154, § 1-3; Gen. L. 1932, c. 265, § 1) without the validity thereof being in issue before the appellate court of either jurisdiction. But judicial pronouncements and observations have been made in both jurisdictions which are interpretative of the words "murder * * * committed with extreme atrocity or cruelty" consonant to judicial sanction of the validity of the provision containing them. (Rep. Haw. v. Yamane, 12 Haw. 189; Commonwealth v. Desmarteau, [16 Gray 1], 82 Mass. 1; Commonwealth v. Gilbert, 165 Mass. 45, 42 N.E. 336; Commonwealth v. Devlin, 126 Mass. 253; Commonwealth v. Feci, 235 Mass. 562 [127 N.E. 602]; Commonwealth v. McGarty, 323 Mass. 435, 82 N.E.2d 603.) In making them, the supreme courts of Hawaii and Massachusetts apparently had no difficulty in ascertaining the meaning of those words and their application to circumstances of murder in any particular case. Thus the supreme court of Massachusetts said that "Those words mean that the means used were 'extreme as compared to ordinary means of producing death.'" Commonwealth v. McGarty, supra, [323 Mass.] at page 440 [82 N.E.2d 603]; Commonwealth v. Devlin, supra, [126 Mass.] at page 255. To the same effect the supreme court of Hawaii approved an instruction which in part reads: "It is not

*denied*, 347 U.S. 956, 74 S. Ct. 683, 98 L. Ed. 1101, *rehearing denied*, 347 U.S. 979, 74 S. Ct. 789, 98 L. Ed. 1118.

In *Territory* v. *Palakiko and Majors*, 38 Haw. 490, the defendants were jointly indicted and tried on three counts of murder, one of which was murder committed with extreme atrocity or cruelty. Defendants Majors and Palakiko were convicts on a work crew. After escaping from custody, they proceeded to a remote part of Nuuanu Valley where Mrs. Wilder had her home. The defendants broke into the house, and surprised the ailing, elderly Mrs. Wilder. Five days later her dead body was found. She had been bound and gagged. Her jaw had been broken in five places. She had been raped. She had been left bound

---

necessary in order to convict the defendants of * * * murder * * * with extreme atrocity or with extreme cruelty to prove that * * * the manner of committing it was the most atrocious or the most cruel possible; but the crime must have been committed with atrocity or with cruelty of a higher degree than is usually incident to murder." (Rep. Haw. v. Yamane, supra [12 Haw.] at page 209.) In similar vein, the supreme court of Massachusetts approved an instruction on murder committed with extreme atrocity and cruelty by observing that "The crime of murder always implies atrocity and cruelty in the guilty party; but there are degrees of criminality in that respect, even in the felonious and malicious taking of human life; and, in order to justify a finding of murder in the first degree, it requires that something more than the ordinary incidents of the crime shall exist—something implying more than ordinary criminality, and manifesting a degree of atrocity or cruelty which must be considered as peculiar and extreme." (Commonwealth v. Devlin, supra, [126 Mass.] at page 255.) Such judicial pronouncements and observations are persuasive in harmony with the ordinary and commonly accepted meaning of the words contained in the provision and therefore explanatory of the fact that the issue of the provision's invalidity for vagueness or uncertainty has never been raised for appellate decision. Being of clear and unambiguous language, the provision in my opinion contains sufficient standards of guilt which readily can be determined by a jury objectively from the circumstances under which a murder has been committed such as those under which Palakiko and Majors committed murder and such as the comparable circumstances under which the defendants in the Devlin, Feci and McGarty cases, supra, committed murder. It thus meets the test of conveying sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. (See Connally v. General Constr. Co., 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322]; Jordan v. De George, 341 U.S. 223 [71 S.Ct. 703], 95 L.Ed. 886.) Nor are impossible standards of specificity required. I therefore declare the provision to be constitutional and the count of indictment based on it as well as the entire criminal proceedings against Palakiko and Majors to be valid.'" *Palakiko* v. *Harper*, 209 F.2d 75, 100-01, n.35.

and gagged on her bed to either choke to death or starve.

The sufficiency of evidence was reviewed by this court, which stated:

"* * * [T]he voluminous record has been scrupulously studied and the evidence carefully reviewed. As a result, this court finds an abundance of substantial evidence which is not only undisputed, but conclusively proves guilt, and that the record unquestionably demonstrates that the defendants throughout received a fair and impartial trial under proper instructions of law. * * *" *Territory* v. *Palakiko and Majors, supra* at 493.

Palakiko and Majors appealed from the denial of the writ of habeas corpus in *Application of Palakiko and Majors,* 39 Haw. 167, to the Ninth Circuit Court of Appeals, *Palakiko* v. *Harper, supra.* In denying the appellants' contention that the statute was unconstitutional, the court said:

"When we consider the meaning of 'extreme atrocity or cruelty', it is plain that there may be borderline cases with respect to which doubt might exist as to whether the facts fell within or without the term. Clearly enough the facts of the offense here committed are such that there cannot be doubt that this was a murder with extreme atrocity or cruelty. An elderly woman, with her jaw broken in five places, in consequence of repeated assaults, bound hand and foot and strapped to her bed, and left alone to starve in case she did not choke to death, had been plainly murdered under the circumstances described in the definitions quoted by Mr. Justice Le Baron from the decisions of courts of Hawaii and Massachusetts. [*Application of Palakiko and Majors,* 39 Haw. 141]. This crime was 'committed with atrocity or with cruelty of a higher degree than is usually incident to murder.' Here was

'something more than the ordinary incidents of crime. * * * Something manifesting a degree of atrocity or cruelty which must be considered as peculiar and extreme.' * * *" *Palakiko* v. *Harper, supra* at 101.

Our latest case on this question of murder committed with extreme atrocity or cruelty is *Territory* v. *Josiah,* 42 Haw. 367. The details surrounding the beating as testified to by a police officer as defendant's voluntary statement were:

"* * * When they got up to the scene, he [defendant] made Fujita [deceased] back his car off the highway. Then he took the payroll money which was in a cardboard box, and he put it in his car. Then he made Earl Fujita walk down a little gully. Earl Fujita then asked him whether they were going to tie him up. He said, yes, they were going to tie him up. Then Earl Fujita, and he also asked Earl Fujita if Earl was going to turn him in. Fujita told him, yes, he had to turn him in because someone had to take the rap. Then he pointed the gun at Earl Fujita and stated that he pulled the trigger. He stated then that the gun didn't go off. It did not fire but instead of that the clip fell off the gun, fell to the ground. It was when Earl Fujita saw this, Earl Fujita jumped him and they got into a fight. He stated that there was a terrific fight there and that his brother came to his aid and grabbed Fujita from the back and held him and he struck Fujita a number of blows on his head and body with the gun. Then he stated that the gun flew out of his hand, fell on the ground. Told his brother to pick it up, so the brother picked up the gun and the brother also struck Fujita with the gun. After a while, he said Fujita just layed [*sic*] there on the ground. So he grabbed Fujita by the shirt and lifted him up and noticed that there were a number of cuts on his head and that he was bleeding

quite badly. So he eased Fujita back on the ground and both of them then walked away from the gully, they got into their car and they drove off. He further stated that his clothing and also the clothing of his brother had blood on it so they drove around trying to find a place to wash up. * * *" *Territory* v. *Josiah, supra* at 393-94.

On appeal to this court, appellant raised the same objection we have in this case—that the trial court erred in not granting his motion to dismiss Count II (Murder with extreme atrocity and cruelty) for there was "absolutely no sufficient evidence in the records with reference to any savagery, brutality or in other words, extreme atrocity or cruelty sufficient to go to the jury * * *." *Territory* v. *Josiah, supra* at 376.

This court reviewed the evidence and found that there was substantial and sufficient evidence to warrant submission of the case to the jury on both counts. It stated:

"Police officer Herbert Chang, as a witness for the Territory, had testified in substance that on January 9, 1953, at about 12:59 P.M., he arrived at the scene of the alleged crime near the Moanalua golf course; that he there saw the victim, Earl Takao Fujita; that the latter was lying on his back, face up, his body parallel to the highway; he was unconscious but still alive. He was moaning and very feebly turning his body from side to side. There was a hole on the top of his head about two inches in diameter and as he moved there was a mass of red matter 'that would come up slowly through the hole and go back down, almost in time with his breathing.' The victim and his head 'was smattered with blood.'

"Police Sergeant Daniel K. Toomey, who was also there with officer Chang, but arrived at the scene shortly after the latter, testified, as a witness for the

Territory, that the victim 'was all covered with blood on the face and the front portion of his clothing, face swollen, eyes closed, busted lips, big hole on the left temple region, also another semi circular hole under the left ear.'

"See also the testimony of Dr. Alvin Majoska as quoted *supra,* to the effect that the skull of the victim showed that the latter had been struck several times.

"There was also additional visual evidence, such as prosecution's exhibit number seven, an enlarged photograph of his head wrapped in bandage and of the shoulders of the victim, Earl Takao Fujita; prosecution's exhibit number eight, an enlarged photograph of the left side of the victim's head taken at the city and county morgue; prosecution's exhibit number nine, an enlarged photograph of part of the top and left side of the victim's head; and prosecution's exhibit number eleven, referred to in Dr. Majoska's testimony, *supra.*" *Territory* v. *Josiah, supra* at 404-05.

The evidence is clear that the victim in this case was a mere four feet five inches tall and weighed only 90 pounds. She was approximately 76 years old. The defendant was 22. After hitting her two or three times with his fist, he cradled her head in his left arm and held her head tight against his body, thus imprisoning her in a headlock. He reached in his pocket for his brass knuckles and put them on his right hand, and proceeded to hit and pummel her on the head four or five times. The medical testimony showed a fractured skull. All the doctors testified that it would take considerable force to cause a skull fracture. The fracture was about six or seven inches long, from above the left eye to the back of the head. Her condition upon arrival at the Emergency Hospital was serious. She was completely unconscious. She was unable to breathe, and to keep her alive the doctors had to make a

hole in her windpipe and attach her to an artificial breathing machine. She had bruises around both eyes. One eye was completely shut.

After carefully considering the statements of this court in *Republic of Hawaii* v. *Tsunikichi, supra; Republic of Hawaii* v. *Yamane, supra; Territory* v. *Palakiko and Majors, supra; Territory* v. *Josiah, supra,* on the manner in which the victims were murdered and the circumstances surrounding the murders, we cannot agree with defendant that the evidence in this case was insufficient to support a conviction of murder committed with extreme atrocity and cruelty.

Defendant's Specification of Error No. 5 reads as follows:

"The Court erred in giving Court's instructions Nos. 32, 34, 37 (as modified), and 38, and in giving State's instruction No. 5. These instructions all define, in one way or another, the term 'extreme atrocity and cruelty', and the objection to their being given is that this issue should not have been submitted to the jury."

The above specification of error fails to comply with Rule 3(b)(4) of the Rules of the Supreme Court, 43 Haw. 439, 440, that in such case "* * * the specification shall set out the part referred to *totidem verbis,* whether it be in instructions given or in instructions refused, together with the objections urged at the trial. * * *"

Moreover, with one exception, the only contention made was that these instructions should not have been given inasmuch as the issue of extreme atrocity and cruelty should not have been submitted to the jury. This has been answered in the discussion on the sufficiency of the evidence.

As to Instruction 38, it was further objected that the court should not have mentioned "pain and suffering, if any, endured by the person killed" as a circumstance per-

tinent to a determination as to whether there was "extreme atrocity" or "extreme cruelty." In *Commonwealth* v. *Devlin,* 126 Mass. 253, the Massachusetts court approved an instruction which submitted to the jury, for its consideration as to whether the murder was committed with extreme atrocity and cruelty, the circumstance of prolonged agony after infliction of severe and violent blows. "* * * [T]he jury were required by the instructions to be satisfied that the death was caused by stamping and jumping upon the person of a prostrate woman, and by blows and kicks inflicted with great violence, and repeated during the afternoon and evening, from which, after prolonged agony, she finally died. There can be no doubt that this presents a case of savage, unfeeling, and long continued brutality of purpose, which fully justified the jury in finding the defendant guilty of extreme atrocity and cruelty. * * *" *Commonwealth* v. *Devlin, supra* at 255. See also *Commonwealth* v. *Gilbert,* 165 Mass. 45, 42 N.E. 336. There was no error in the submission of Instruction 38.

In Specification of Error No. 2, defendant assigns as error the admission of Exhibit 13-B into evidence, on the ground that it was highly prejudicial to the defendant and would tend to inflame the jury.

Exhibit 13-B was a photograph of the head and shoulders of the deceased, Mrs. Chiyono Fujino. It was taken at an angle different from all the other photographs which were introduced into evidence. From this angle, certain bruises and lacerations were visible which were not evident in the other exhibits. In addition, it was used as an aid to the testimony of witness Bennett.[2] The photograph

---

[2] Direct examination of Dr. Bennett:

"Q   Doctor, I am handing you Prosecution's Exhibit 13-B for Identification and ask you whether you had anything to do with any of the suturing shown in this potograph.

"A   The only —.

showed a 12-centimeter sutured incision from the craniectomy. The trial judge admitted the photograph into evidence but not without first admonishing the jury to disregard the surgical incision.

In *Territory* v. *Josiah, supra,* this court was presented with the same question. A photograph showing the brain was admitted into evidence. The doctor who performed the autopsy used the photograph in explaining the extent of the injuries to the jury. This court stated: "Undoubtedly, prosecution's exhibit eleven was of assistance to the jury in intelligently understanding Dr. Majoska's testimony. In that respect it had probative value. * * * The admission in evidence of prosecution's exhibit eleven was mainly, if not entirely, one of discretion of the trial court, and, in view of the testimony of Dr. Majoska which preceded its admission and that it was admitted for the purpose of clarifying his testimony, this court deems that the discretion of the trial judge was properly exercised and that court did not commit error in its admission of the exhibit in evidence. * * *" *Territory* v. *Josiah, supra* at 385. Such is the case here. See also *Territory* v. *Joaquin,* 39 Haw. 221.

However, the use of the photograph as a testimonial aid is not the only basis for sustaining the trial court's

---

"THE COURT: (Interrupting) It isn't in evidence yet, Doctor, so would you hold it so that only you are looking at it?
"WITNESS: Yes. The only part of my operating procedure is the long incision in front and above the left ear.
"MR. TOKAIRIN: Running vertical to the head?
"WITNESS: Yes.
"Q (By Mr. Tokairin) Now, Doctor, looking at the same photograph on the top end of your incision, there is a darkened area. Could you describe—was it there or was it a part of your operation?
"A This is a bruise which was present before.
"Q This area here I am pointing out.
"A No, that is blood from the operating incision. The large area back here was there before surgery; and so was the other.
"THE COURT: So that the dark area at the top of the sutured incision is blood as a result of the operation, is that right?
"WITNESS: Yes."

ruling. The photograph showed four other bruises and lacerations which were not visible in the other exhibits.

In *Commonwealth* v. *Knowlton*, 265 Mass. 382, 163 N.E. 251, a prosecution for murder committed with extreme atrocity or cruelty, two photographs were admitted into evidence. Both showed the size and location of a wound upon the right side of the head. The court stated: "* * * The ground of the objection to this evidence was that the gruesomeness of the photographs could have no legitimate bearing upon any issue, and that their admission would tend to prejudice the jury against the defendant. It is plain that the photographs were competent upon the issue, whether the murder was committed with extreme atrocity or cruelty, as they show the nature and extent of the wound which caused death, and it might have been found that the force exercised to accomplish the result indicated extreme cruelty. * * *" *Commonwealth* v. *Knowlton, supra* at 386, 163 N.E. at 253.

Here the trial judge properly exercised his discretion in allowing Exhibit 13-B into evidence. From the angle of this photograph, the jury could see and understand the atrociousness of the crime. It showed bruises and lacerations not visible in other photographs. The size, character and number of wounds, and the severity of the beating was material to the issue of whether the killing was the result of extreme atrocity or cruelty. See *Territory* v. *Josiah, supra; Territory* v. *Joaquin, supra; Jackson* v. *State,* 67 Okla. Crim. 422, 94 P.2d 851; *Young* v. *State,* 38 Ariz. 298, 299 Pac. 682; *Blazka* v. *State,* 105 Neb. 13, 178 N.W. 832; Scott, *Photographic Evidence,* § 661; Annot., 159 A.L.R. 1413. No error was committed.

Defendant contends in his Specification of Error No. 3 that error was committed by the trial judge in allowing into evidence a drawing by a witness of brass knuckles.

The witness, age 17, was first found competent by the

court. She testified that she had ridden in defendant's automobile past the victim's residence the day before the killing. She stated that there was a set of brass knuckles on the floor of the front seat of the automobile. She admitted picking up and playing with the set. The drawing showed the blunt striking edges of the instrument.

In his confession, defendant admitted using brass knuckles while hitting the victim. He stated that he threw the set away after the commission of the crime. It was never found by the police. Defendant's contention that the brass knuckles were "not properly tied up to the Defendant" is without merit. The possession of brass knuckles by the defendant was a material fact to be found by the jury, before determining whether the manner in which they were used on the deceased and all the circumstances surrounding the murder made the murder one with extreme atrocity or cruelty. See *State* v. *Peters,* 44 Haw. 1, 352 P.2d 329; *State* v. *Garner,* 166 Ore. 1, 108 P.2d 274; *People* v. *Boford,* 117 Cal. App. 2d 576, 256 P.2d 334; 2 Wharton, *Criminal Evidence,* § 685.

Likewise, defendant's contention that the drawing was not to scale does not preclude the admission of this drawing. "The admission of * * * sketches rests within the discretion of the trial judge, and his action will not be reversed in the absence of an abuse of discretion." 2 Wharton, *Criminal Evidence,* § 685, p. 649. See also *State* v. *Peters, supra* at 4, 352 P.2d at 331. Furthermore, the fact that the drawing made by the witness was not to scale was made clear to the jury by the trial court and defense counsel. See Annot., 9 A.L.R.2d 1044.

Defendant's fourth specification of error is that the court improperly admitted in evidence a bloodstained bedsheet, Exhibit 27-A, and bloodstained pillow case, Exhibit 27-B on the grounds that "they were highly prejudicial to the defendant and for which no proper foundation was

laid." After carefully reviewing the record, we are of the opinion that this assignment is without merit. The exhibits were relevant to the issue of extreme atrocity or cruelty involved in the killing. *Miranda* v. *State,* 42 Ariz. 358, 26 P.2d 241; 26 Am. Jur., *Homicide,* § 447. See also *State* v. *Stogsdill,* 324 Mo. 105, 23 S.W.2d 22; *Hendrickson* v. *Commonwealth,* 235 Ky. 462, 31 S.W.2d 712. The contention that the exhibits were stained with the blood of Mr. Fujino, as well as Mrs. Fujino, is convincingly met by the State, which points out that Mr. Fujino was attacked as he lay on a bed on the ground floor, and that on discovering his wife's condition he lifted his wife off the bed where she lay and sat on the floor with her in his arms. He did not lie on the bed from which the sheet and pillow case were taken. The jury, by examining the location, size and shape of the blood stains, could determine that they represented a pool of blood where Mrs. Fujino lay before she was lifted from the bed. The discretion of the trial judge in admitting such exhibits will not be disturbed unless it has been clearly abused. We find no abuse here.

Appellant's last assignment of error is that the court erred in denying his motion for a new trial based on the over-all admission of the exhibits into evidence. This contention has been answered in the discussion on the admissibility of exhibits.

Affirmed.

*Robert A. Franklin* for defendant-appellant.

*John H. Peters,* Prosecuting Attorney, and *Bert S. Tokairin,* Deputy Prosecuting Attorney, for plaintiff-appellee.